KENTUCKY CENTRAL LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5290–67. Filed January 11, 1972.

*Charles R. Hembree* and *Philip E. Wilson*, for the petitioner.
*Rodney G. Haworth*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax as follows:

| Year | Deficiency |
|------|------------|
| 1958 | $105, 495. 82 |
| 1959 | 86, 471. 00 |
| 1960 | 81, 586. 44 |
| 1961 | 138, 001. 24 |

Certain issues raised in the pleadings have been conceded by petitioner. The primary issue remaining for our decision herein is whether petitioner understated its premium income in 1961 by the amount of $1,650,000 under the provisions of section 809(c)(1), I.R.C. 1954,[1] with respect to consideration received for assuming liabilities under contracts of insurance not issued by petitioner (assumption reinsurance). If we determine that petitioner did understate its premium income in 1961 by $1,650,000, we must then decide (1) whether only $1,400,000 of that amount is amortizable, and (2) whether respondent erred in allowing the amortization on a straight-line basis for a period of 12 years.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is a life insurance company, organized and existing under the laws of the Commonwealth of Kentucky, with its principal place of business being located in Lexington, Ky. It filed its Federal life

---

[1] All section references are to the Internal Revenue Code of 1954, as amended.

insurance income tax returns for the calendar years 1958 through 1961 with the district director of internal revenue, Louisville, Ky. It also filed amended returns for the years 1958, 1959, and 1960.

Petitioner began in 1902 as a mutual assessment company and was incorporated as a stock life insurance company in 1917. During the taxable years at issue petitioner was a legal reserve life insurance company.

On February 28, 1961, petitioner and Guaranty Savings Life Insurance Co. (hereinafter referred to as Guaranty) entered into an "Agreement of Sale and Reinsurance" (hereinafter referred to as the agreement). The agreement was approved by the superintendent of insurance, State of Alabama, on March 22, 1961, and by the commissioner of insurance, Commonwealth of Kentucky, on March 28, 1961.

The agreement provided, in pertinent part, as follows:

RECITALS

Guaranty desires to reinsure with and into Kentucky Central all of its insurance business and risks commonly referred to as Guaranty's Charlotte Division business or Guaranty's Skyland business, being Guaranty's North Carolina, South Carolina, Tennessee and Georgia insurance business now serviced by and through Guaranty's branch or division office located in Charlotte, North Carolina. Except for new business written through the Charlotte Division since November 1, 1959, Guaranty's Skyland business consists of the weekly premium life and A & H business, monthly debit ordinary life business, credit life and credit A & H business and the regular ordinary life business of Skyland Life Insurance Company, a North Carolina life insurance company which was merged with and into Guaranty effective on November 1, 1959. Guaranty's Skyland business is described more specifically hereinafter. Any business in the State of Mississippi which may be serviced by the Charlotte Division is not covered by this agreement. Guaranty also desires to sell and transfer to Kentucky Central its Charlotte Division office building, automobiles, office equipment, supplies, books, records, agency force and other properties directly related to Guaranty's Skyland business.

Kentucky Central desires to assume and reinsure all of Guaranty's Skyland business, and to indemnify Guaranty from all liabilities thereunder, and to purchase and acquire said office building in Charlotte and said other properties referable to Guaranty's Skyland business.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(1) SALE AND CESSION BY GUARANTY

Guaranty hereby sells, assigns, cedes to and reinsures with Kentucky Central, as of the effective date hereof, all of its said Skyland insurance business, as the same shall exist on said effective date, the insurance policies representing Guaranty's Skyland business \* \* \* together with all rights and remedies of Guaranty therein and thereto, including, by way of enumeration and not of limitation, the right to collect and to receive from the holders of all said policies all payments on account of premiums, loans, interest, or otherwise, which may now or hereafter be or become due by virtue of any such policies and contracts of insurance, including all rights and benefits under any subsisting reinsurance agreements referable to any risks under such policies and contracts; and Guaranty, as of said effective date, shall therewith transfer, assign, set over and deliver to Kentucky Central all policy forms, books, documents, papers, records, files, and everything

in anyway whatsoever pertaining or related to said insurance policies and risks. * * *

(2) ASSUMPTION AND REINSURANCE BY KENTUCKY CENTRAL

Kentucky Central hereby assumes and reinsures, as of the effective date hereof, all of the policies and contracts of insurance, according to the terms thereof, covered by this agreement and described in the paragraph next preceding, * * *

\*          \*          \*          \*          \*          \*          \*

(4) CONCERNING THE RESERVES

Kentucky Central shall, coincident with the effective date hereof, set up, establish and assume liability for all policy reserves required by law or by the terms of the policies, or otherwise required by accepted insurance accounting practices, on or in connection with the insurance business and risks herewith ceded by Guaranty to Kentucky Central; and Kentucky Central thereupon will assume all liabilities under all of said policies so that upon and after the effective date hereof Guaranty shall be forever relieved of any and all liability whatsoever with respect to any of said policies and reserves therefor; and any amount now carried by Guaranty on its books as reserves on or with respect to said insurance business and risks shall be forthwith released to its surplus account.

\*          \*          \*          \*          \*          \*          \*

(6) SALE OF TANGIBLE PERSONAL PROPERTIES

Guaranty shall, as of the effective date hereof, sell, assign, transfer, set over and deliver to Kentucky Central, and Kentucky Central shall purchase and acquire, all files, policy forms, supplies, records, books, automobiles, typewriters and other business equipment used or useful in connection with Guaranty's Skyland business, including all office furniture, fixtures, adding machines, calculators and all other items of tangible property belonging to Guaranty and now located in or at its office building in Charlotte, North Carolina, and its North Carolina district offices * * *.

(7) SALE OF CHARLOTTE REAL ESTATE

Guaranty hereby agrees to sell, transfer and convey to Kentucky Central, and Kentucky Central hereby agrees to purchase and acquire, the real estate, together with all fixtures and appurtenances thereto, located at 118 South Church Street, Charlotte, Mecklenburg County, North Carolina.

(8) PURCHASE PRICE

The aggregate purchase price to be paid by Kentucky Central to Guaranty for Guaranty's Skyland business and related assets being sold and ceded hereunder to Kentucky Central shall be $1,800,000.00 allocated as follows:

$145,000.00 for the real estate located at 118 South Church Street, Charlotte, North Carolina.

$5,000.00 for the office equipment, furniture, fixtures, typewriters, adding machines, calculators and similar depreciable assets located in said division and district offices in North Carolina.

$1,650,000.00 for Guaranty's Skyland business reinsured by Kentucky Central hereunder.

(9) PAYMENT OF PURCHASE PRICE

Against the aggregate purchase price of $1,800,000.00 payable by Kentucky Central to Guaranty, as provided in paragraph (8) above, Kentucky Central shall be allowed a credit equal to the reserves, as of the effective date hereof, required by law or by the terms of the policies, or otherwise required by accepted insurance accounting practices (including appropriate adjustments for gross premiums paid

in advance and net due and deferred premiums), on or in connection with the insurance business and risks herewith ceded by Guaranty to Kentucky Central. Cash equal to any amount by which said total reserve requirements exceed $1,800,000.00 shall be paid over by Guaranty to Kentucky Central at the closing hereunder.

Said required reserves on such insurance business and risks shall be computed and certified to the parties hereto by Nelson & Warren, Consulting Actuaries, St. Louis, Missouri, as soon as reasonably practicable after the effective date hereof. * * *

(10) EFFECTIVE DATE

The effective date of this agreement, as to the transfer, assignment and cession of Guaranty's Skyland business and the assumption and reinsurance of said business and risks by Kentucky Central, shall be 11:59 P.M. on Friday, March 31, 1961; * * *

\* \* \* \* \* \* \*

(13) CONCERNING THE CLOSING HEREUNDER

\* \* \* \* \* \* \*

(b) Guaranty shall deliver to Kentucky Central at the closing hereunder the following:

\* \* \* \* \* \* \*

Any other instruments or documents of transfer, assignment and conveyance which in the reasonable opinion of counsel for Kentucky Central shall be required or necessary in order fully to vest in Kentucky Central all of the insurance business and assets of Guaranty being sold and ceded to Kentucky Central hereunder.

\* \* \* \* \* \* \*

Cash in the amount, if any, by which said net reserve requirements on the insurance policies and risks herewith ceded to Kentucky Central exceed $1,800,000.00.

(c) Kentucky Central shall deliver to Guaranty at the closing hereunder cash in an amount equal to the amount, if any, by which $1,800,000.00 exceeds said net reserve requirements on the business and risks herewith ceded by Guaranty to Kentucky Central.

Pursuant to the agreement the actuarial firm of Nelson & Warren, Inc., determined the reserves for the ordinary business and the industrial business that was being reinsured by petitioner; however, as of the time of closing they were unable to determine to the satisfaction of petitioner and Guaranty the reserves for the credit insurance business being reinsured. Therefore, in order to allow additional time for a more accurate determination of the credit insurance reserves, and to provide a method of handling such reserves, petitioner and Guaranty on June 8, 1961, entered into a supplemental agreement.

The supplemental agreement provided, in pertinent part, as follows:

Guaranty and Kentucky Central entered into an Agreement of Sale and Reinsurance under date of February 28, 1961, which provides for the sale and cession by Guaranty, and the purchase and reinsurance by Kentucky Central, of Guaranty's insurance business heretofore serviced by and through its branch or division office located in Charlotte, North Carolina, and certain other assets, all referred to in said agreement as Guaranty's Charlotte Division business or Guaranty's Skyland business. The bulk reinsurance under said agreement was effec-

tive on April 1, 1961. Said agreement of February 28, 1961, is incorporated herein by reference for all appropriate purposes.

Said agreement of February 28, 1961, provides, among other things, that Guaranty shall receive total consideration of $1,800,000.00 for said Charlotte Division business and assets; that against said purchase price Kentucky Central shall be entitled to a credit equal to the reserves required by law or by the terms of the policies, or otherwise required by accepted insurance accounting practices, on or in connection with the insurance risks reinsured by Kentucky Central; that Kentucky Central will establish and maintain said reserve liabilities; that Nelson & Warren, Consulting Actuaries, St. Louis, Missouri, will compute said reserve requirements and certify the same to both parties; * * *. Guaranty and Kentucky Central have agreed that Kentucky Central is entitled to receive credit for net reserve liabilities (after taking into account appropriate adjustments for net due and deferred premiums, premiums paid in advance, policy loans and various other items) in the amount of $1,628,080.61, not including, however, any credit for unearned premium reserves, policy reserves and claim liability reserves referable to the credit life and credit accident and health policies (herein sometimes referred to as the "credit insurance business" or the "credit insurance policies") reinsured by Kentucky Central from Guaranty. Nelson & Warren advised Guaranty and Kentucky Central that, for various reasons, they could submit only a conservative estimate of the reserve liabilities referable to said credit insurance policies. In lieu of effecting a final settlement between the parties with respect to Guaranty's reserve liabilities as of March 31, 1961, on said credit insurance business based merely on estimates, the parties have agreed to establish and administer a special fund for the purposes and in the manner herein described.

This agreement does not contemplate retrocession of any of the credit insurance business to which it pertains, but merely provides a method, deemed equitable by both parties, whereby the actual reserve liabilities of Kentucky Central under such policies ceded and sold to Kentucky Central by Guaranty may be more accurately ascertained.

WITNESSETH:

Now, THEREFORE, in consideration of the premises, and in consideration of the promises, payments and undertakings herein set forth, Kentucky Central and Guaranty mutually agree as follows:

(1) Guaranty acknowledges receipt of Kentucky Central's check in the amount of $171,919.39 ($1,800,000.00—$1,628,080.61).

(2) Kentucky Central acknowledges receipt of Guaranty's check in the amount of $250,000.00, and such check shall be deposited forthwith to a special account in Kentucky Central's name at the Bank of Charlotte, Charlotte, North Carolina (said bank account being referred to herein sometimes as the "Special Account"), to be used and dealt with as herein prescribed. If the Special Account becomes depleted during the term of this agreement Guaranty shall pay over to Kentucky Central from time to time additional sums to be deposited to such account; provided, however, that the sum of said initial payment of $250,000.00 and the aggregate of such additional payments shall not exceed $581,500.00.

* * * * * * *

(4) Promptly after the establishment of the Special Account an amount equal to the sum of (a) and (b) below shall be paid from the Special Account to Kentucky Central:

(a) A sum equal to the total of all legal and proper claims paid by Kentucky Central (on and after April 1, 1961, and prior to establishment of the Special

Account) pursuant to the provisions of credit insurance policies written by Guaranty prior to April 1, 1961, and reinsured by Kentucky Central under the agreement of February 28, 1961; provided that such reimbursement shall not cover any claim paid by Kentucky Central under a policy for a loss reported after such policy had been lapsed, cancelled or rewritten by Kentucky Central.

(b) A sum equal to the total of all unearned premiums (less commissions already paid or allowed by Guaranty on such unearned premiums) returned, refunded or otherwise allowed by Kentucky Central on and after April 1, 1961, in connection with credit insurance policies written by Guaranty prior to April 1, 1961, and cancelled or rewritten by Kentucky Central on and after April 1, 1961, and prior to establishment of the Special Account.

(5) During the period from the establishment of the Special Account to November 1, 1961, the following liabilities referable to the credit insurance policies reinsured by Kentucky Central from Guaranty shall be paid from the Special Account:

(a) Liabilities for losses incurred and reported prior to November 1, 1961, (not including, however, claims covered by subparagraph (4) (a) above) under said credit insurance policies reinsured by Kentucky Central; provided that no payment from the Special Account shall be made for a claim under a policy which is lapsed, cancelled or rewritten by Kentucky Central prior to the occurrence and reporting of the loss on which the claim is based.

(b) Unearned premiums (less commissions already paid or allowed by Guaranty on such unearned premiums) returned, refunded or otherwise allowed by Kentucky Central after establishment of the Special Account and prior to November 1, 1961, in connection with credit insurance policies written by Guaranty prior to April 1, 1961, and cancelled or rewritten by Kentucky Central prior to November 1, 1961. Such unearned premiums will be paid over periodically to Kentucky Central from the Special Account.

(c) Any net commissions due and owing by Guaranty with respect to premiums received by or for Guaranty prior to April 1, 1961, on credit insurance policies written by Guaranty prior to April 1, 1961.

\*        \*        \*        \*        \*        \*        \*  ·

(8) (a) Promptly after November 1, 1961, and in no event later than December 1, 1961, Nelson & Warren shall be retained to compute Kentucky Central's remaining reserve liabilities as of November 1, 1961, on or in connection with said credit insurance policies ceded by Guaranty to Kentucky Central as of April 1, 1961, and still in force on October 31, 1961, (not having been lapsed, cancelled or rewritten by Kentucky Central prior to November 1, 1961), and certify such computations to Kentucky Central and Guaranty. An amount equal to such remaining reserve liabilities shall be paid from the Special Account to Kentucky Central, the Special Account shall be closed and the remaining balance, if any, shall be returned free and clear to Guaranty. \* \* \*

\*        \*        \*        \*        \*        \*        \*

(9) Guaranty's maximum liability to Kentucky Central in connection with the credit insurance business ceded to Kentucky Central under the agreement of February 28, 1961, and consequently Guaranty's maximum obligation to make payments for deposit to the Special Account, is $581,500.00. Kentucky Central shall be solely responsible for all reserve liabilities and other liabilities, duties and obligations in excess of $581,500.00 under, or resulting from, said credit insurance business reinsured by Kentucky Central. No part of Kentucky Central's overhead expenses, nor any service or administrative fees, shall be paid to Kentucky Central from the Special Account or by Guaranty.

Also, on June 8, 1961, petitioner and Guaranty entered into a closing agreement wherein they computed a complete settlement of the transaction exclusive of the reserves for the credit business. The closing agreement provided as follows:

### CLOSING STATEMENT

Pursuant to Agreement of Sale and Reinsurance Dated February 23, 1961, Between Guaranty Savings Life Insurance Company and Kentucky Central Life and Accident Insurance Company

| | | |
|---|---:|---:|
| Total purchase price due Guaranty | | $1, 800, 000. 00 |
| Credits due Kentucky Central: | | |
| Reserves for ordinary life | $829, 151. 00 | |
| Reserves for industrial life | 839, 155. 00 | |
| Reserves for claim liability | 14, 096. 00 | |
| Advance premiums | 31, 716. 30 | |
| | | 1, 714, 118. 30 |
| | | 85, 881. 70 |
| Credits due Guaranty Savings: | | |
| Net due and deferred premiums | 65, 510. 27 | |
| Policy loans (adjustment for accrued and prepaid interest) | 16, 563. 49 | |
| | | 82, 073. 76 |
| Tentative amount due from Kentucky Central to Guaranty | | 167, 955. 46 |
| Other credits due Kentucky Central: | | |
| Federal documentary stamps on deed | 159. 50 | |
| Ad valorem taxes 1/1/61–3/31/61 | 660. 04 | |
| | | 819. 54 |
| | | 167, 135. 92 |
| Other credits due Guaranty: | | |
| Ernest & Ernest letter dated May 17, 1961 | 4, 783. 47 | |
| Adjusted re commissions for Mar. 30 & 31 | —— | |
| | | 4, 783. 47 |
| Net amount due from Kentucky Central to Guaranty [1] | | 171, 919. 39 |

The foregoing closing statement is approved and accepted, and the net amount due Guaranty has been paid and is hereby acknowledged, this 8th day of June, 1961.

---

[1] This figure does not reflect any credit due Kentucky Central with respect to reserve liabilities of Guaranty under credit life and credit A & H insurance policies. That aspect of the settlement between the parties is disposed of under separate agreement of even date herewith.

Pursuant to the closing agreement and the supplemental agreement petitioner paid Guaranty on June 8, 1961, $171,919.39, the amount by which the purchase price of $1,800,000 exceeded the amount of reserves and other obligations assumed by petitioner, exclusive of the reserves for the credit insurance business. At the same time, Guaranty paid $250,000 into a special account which was set up pursuant to the supplemental agreement for the payment by petitioner of liabilities arising under the credit insurance policies reinsured and assumed by petitioner.

Pursuant to the terms of the agreement, Guaranty transferred to petitioner real estate valued at $145,000, furniture, fixtures, and related miscellaneous assets valued at $5,000, and the insurance policies in force reinsured by petitioner valued at $1,650,000. With respect to the insurance policies reinsured by petitioner, petitioner received the policy files from Guaranty which consisted of applications and various other documents, such as medical examinations, credit reports, etc., that were pertinent to the issuance of the policies. Petitioner issued to the policyholder of each ordinary life and industrial life policy which petitioner had reinsured from Guaranty a certificate of assumption under which petitioner agreed to assume all liability of Guaranty under the policy. Petitioner did not acquire the right to use Guaranty's name in its business and Guaranty continued to exist and operate as a life insurance company. Goodwill was not an item specifically considered by the parties in arriving at the terms of the agreement.

On April 1, 1961, petitioner had in its employment 124 insurance agents who had formerly been employed by Guaranty prior to the agreement, and who thereafter became petitioner's personnel. Of this total, 74 remained employed by petitioner as of December 31, 1961, 33 remained so employed as of December 31, 1962, and 23 were still employed by petitioner as of December 31, 1964. For the most part the employees were debit agents as opposed to ordinary insurance agents.[2] An ordinary agent is an independent contractor who has vesting rights in his contract, while a debit agent is an employee of the insurance company who normally does not have vesting rights in his contract. Petitioner experienced a turnover rate of approximately 90 percent of its debit agents each year.

Nelson & Warren, Inc., finally computed the reserves on the credit business reinsured by petitioner to be $33,907.28 as of November 1, 1961. This amount together with the amounts actually paid from the

---

[2] Some of the employees acquired in the transaction were district managers and staff managers.

special account set up pursuant to the supplemental agreement of June 8, 1961, brought the total of such reserves to $260,375.81. In view of the fact that Guaranty had already placed $250,000 in the special account, it paid petitioner in April 1962, in accordance with the supplemental agreement, an additional $10,375.81 ($260,375.81 minus $250,000).

Taking into account the reserves on the credit insurance business, petitioner assumed total reserves of $1,960,398.11. Since this amount, together with the claims of $14,096 assumed by petitioner, exceeded the contract price of $1,800,000, Guaranty was obligated to pay petitioner the amount by which the reserves and claims liability exceeded the contract price. Guaranty met this obligation by receiving credit for net due and deferred premiums of $65,510.27, policy loans of $16,563.49, and miscellaneous expense adjustments of $3,963.93, and by paying petitioner $88,456.42 in cash which was represented by the difference between the amount of $171,919.39 which petitioner paid Guaranty on June 8, 1961, and the amount of $260,-375.81 which Guaranty paid petitioner on account of the reserves assumed by petitioner on the credit insurance business. The above is reflected as follows:

Reserves assumed by petitioner:

| | | |
|---|---|---|
| Reserves for ordinary life policies | | $829,151.00 |
| Reserves for industrial policies | | 839,155.00 |
| Reserves for credit policies | | 260,375.81 |
| Reserves for claims | | 14,096.00 |
| Advance premiums | | 31,716.30 |
| Total reserves and other liabilities assumed | | 1,974,494.11 |
| Less credits due Guaranty: | | |
| Net due and deferred premiums | $65,510.27 | |
| Policy loans | 16,563.49 | |
| Miscellaneous expense adjustments | 3,963.93 | 86,037.69 |
| | | 1,888,456.42 |
| Less contract price | | 1,800,000.00 |
| Net amount due petitioner | | 88,456.42 |

The insurance contracts acquired by petitioner from Guaranty represented what was known as Guaranty's Skyland division. Most of the business had been acquired by Guaranty pursuant to a statutory merger between Guaranty and Skyland Life Insurance Co. in 1959, with Guaranty being the surviving company. Thereafter, the name "Skyland" was used by Guaranty only as an internal means of identifying the business in that particular division. The policy forms and other records with respect to such business were changed

to Guaranty's name and the assets formerly owned by Skyland were merged with Guaranty's assets.

Both petitioner and Guaranty agreed in the contract of sale and reinsurance that the Skyland business reinsured by petitioner had a value of $1,650,000. This figure represented the present value of the future profits to be derived from the policies involved. The insurance policies acquired by petitioner were of three basic types—industrial life policies, ordinary life policies, and credit insurance policies. Of the three types of policies acquired, the industrial life policies were considered to have the greater value. The credit insurance policies were single-premium, limited-term nonrenewable policies and most, if not all, of the policies were canceled or had expired prior to December 31, 1961. The ordinary life policies and the industrial life policies were valued by the rule-of-thumb approach whereby the industrial life business is considered to have a value of from 50 to 75 times the size of the debit and the ordinary life business is considered to have a value of approximately $20 per $1,000 of insurance in force.

As of March 31, 1969, petitioner had industrial life and ordinary life policies in force from its acquisition of the Skyland business in the respective face values of $18,809,140 and $8,672,245. As of December 31, 1969, petitioner still had in force policies so acquired in the respective face amounts of $4,014,767 and $3,244,440. Petitioner did not allocate its total cost of $1,650,000 to the various types of insurance policies acquired.

The lapse rate on newly acquired insurance business is fairly extensive with the greatest lapse occurring during the first year that the business is in force. Petitioner's experience in this regard with respect to industrial business was that approximately 34 or 35 percent of the business lapsed during the first year. On the other hand, after the business had been in force for a number of years the lapse rate decreased. Some of the policies reinsured by petitioner had been in force for some time and its expected lapse rate was lower than that expected on newly written policies. The total actual lapse of the industrial business reinsured by petitioner from March 31, 1961, to December 31, 1969, was 78.65 percent and the actual lapse rate over the same period was as follows:

| Year | Percent | Year | Percent |
|---|---|---|---|
| 3/31–12/31/61 | 28.01 | 1966 | 3.68 |
| 1962 | 17.53 | 1967 | 3.07 |
| 1963 | 11.25 | 1968 | 2.29 |
| 1964 | 7.07 | 1969 | 1.81 |
| 1965 | 3.94 | | |

Based upon the above lapse rates and the assumption that the industrial business still in force on December 31, 1969, would persist for

an average of 20 years, the average life of the industrial business reinsured by petitioner would be 6.01 years.

The total actual lapse of the ordinary life business reinsured by petitioner from March 31, 1961, through December 31, 1969, was 62.59 percent. The lapse rate of the ordinary business, projected at the same slope as that of the industrial business, would have been as follows:

| Year | Percent | Year | Percent |
|---|---|---|---|
| 3/31–12/31/61 | 22. 29 | 1966 | 2. 93 |
| 1962 | 13. 95 | 1967 | 2. 44 |
| 1963 | 8. 95 | 1968 | 1. 82 |
| 1964 | 5. 63 | 1969 | 1. 44 |
| 1965 | 3. 14 | | |

Based upon the above lapse rates and the assumption that the ordinary business still in force on December 31, 1969, would persist for an average of 20 years, the average life of the ordinary life business reinsured by petitioner would be 8.87 years.

In its Federal income tax return for 1961, petitioner reported $310,-398.11 as premium income in connection with the reinsurance transaction with Guaranty. Specifically, petitioner reflected the amount of $310,398.11 in a supporting schedule as follows:

| | |
|---|---|
| Nonpar life | $50, 004. 61 |
| Group life | 39, 710. 66 |
| Group accident and health | 220, 665. 15 |
| Cancellable accident and health | 17. 69 |
| Total | 310, 398. 11 |

Petitioner also reported approximately $1 million in premiums it collected in 1961 on the insurance contracts it reinsured from Guaranty. Petitioner reported on its return for 1961 increases in reserves of $2,813,398, which amount included the reserves attributable to policies reinsured from Guaranty that were in force on December 31, 1961. The increase represented the amount petitioner was required under State law to add to its reserves for policies outstanding on December 31, 1961.

The acquisition of insurance business through reinsurance is one of two basic means by which life insurance companies acquire business. The other basic means is through direct sales by agents. The basic objective is the same under both methods, to acquire policies with the expectation of receiving future profits. In acquiring business through direct sales, however, the experience of the insurance industry is that the first-year costs of acquisition are high, normally running 150 to 200 percent of the first-year premium. Such costs consist of the agent's commissions, medical reports, and other regular operating expenses and the establishment of reserves.

In connection with the reinsurance transaction with Guaranty, certain bookkeeping entries were made on petitioner's ledger sheets to record the assumption of the business, as follows:

Premium income—Skyland acquisition _____ $1, 668, 306

Surplus—merger and acquisition _____ $1, 650, 000
Consideration in respect of assuming reserve liabilities (other than
credit business) _____ 18, 306

The effect of these entries was to transfer from surplus to premium income the amount of $1,650,000. The entries were made under the mistaken belief that they were in accordance with the manner in which the State insurance departments wanted this type of transaction handled. (The insurance examiners did not approve of the method of recording the transaction in an examination conducted in 1962.) Petitioner did not believe this method of handling the transaction was proper for Federal income tax purposes and the transaction was not handled in this manner on the Federal income tax return.

In the notice of deficiency respondent determined that petitioner understated its premium income in 1961 in the amount of $1,650,000. Respondent explained the adjustment as follows:

To increase your reported income by the amount of $1,650,000 for the consideration received by you, within the meaning of Section 809(c)(1) of the Internal Revenue Code, from the Guaranty Savings Life Insurance Company. Allocation is as follows:
Nonparticipating ordinary _____ $820, 052. 88
Nonparticipating industrial _____ 828, 352. 31
Industrial accident and health, cancellable _____ 1, 594. 81

Total _____ 1, 650, 000. 00

Respondent further determined in the notice of deficiency that petitioner was entitled to an amortization deduction for a portion of the $1,650,000 based on a 12-year useful life. The determination was as follows:

It is determined that you are entitled to an amortization deduction for a portion of the consideration which you received under your reinsurance agreement with Guaranty Savings Life Insurance Company, computed as follows:
Consideration received from Guaranty Savings Life Insurance
Company _____ $1, 650, 000. 00
Less: Unamortizable portion, going business cost, managers,
agents, organization, etc _____ 250, 000. 00

Net amount _____ 1, 400, 000. 00
$1,400,000 divided by 12 (estimated life of policies) _____ 116, 666. 67

OPINION

The basic issue before us is whether an amount equal to the value of the insurance business received by petitioner in the assumption rein-

surance transaction with Guaranty should be included in premium income within the purview of section 908(c)(1)[3] in determining gain from operations for purposes of this so-called Phase II tax of the Life Insurance Company Income Tax Act of 1959.

Section 809(c) takes into account three categories of items for computing a life insurance company's income from operations. The first category, and the one with which we are concerned herein, is gross premiums and other consideration received on insurance and annuity contracts. Sec. 809(c)(1). Included in the term "other consideration" is, among other things, "consideration in respect of assuming liabilities under contracts not issued by the taxpayer." This language clearly covers an assumption reinsurance transaction in which one life insurance company (reinsurer) becomes solely liable to the policyholders on the contracts transferred to it by another life insurance company (reinsured) and includes in the reinsurer's income from operations the consideration paid it by the reinsured for its assumption of the liabilities under the contracts transferred.

In the assumption reinsurance transaction between petitioner and Guaranty, petitioner assumed reserve liabilities of $1,960,398.11 and had transferred to it specific assets in the net amount of $310,398.11 [4] and insurance business valued by the parties at $1,650,000.[5]

Petitioner contends that within the meaning of section 809(c)(1) it received consideration of only $310,398.11 from Guaranty for its assumption of the reserves under the insurance contracts it acquired in the transaction. Respondent, on the other hand, contends that petitioner assumed reserves of $1,960,398.11 and received in return con-

---

[3] SEC. 809. IN GENERAL.

(c) GROSS AMOUNT.—For purposes of subsections (b)(1) and (2) [computation of gain or loss from operations], the following items shall be taken into account:

(1) PREMIUMS.—The gross amount of premiums and other consideration (including advance premiums, deposits, fees, assessments, and consideration in respect of assuming liabilities under contracts not issued by the taxpayer) on insurance and annuity contracts (including contracts supplementary thereto) ; less return premiums, and premiums and other consideration arising out of reinsurance ceded. Except in the case of amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded, amounts returned where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management shall not be included in return premiums.

(2) DECREASES IN CERTAIN RESERVES.—* * *

(3) OTHER AMOUNTS.—* * *

[4] The assets received by petitioner, other than the insurance contracts, consisted of cash ($88,456.42), real estate ($145,000), furniture, fixtures, and miscellaneous equipment ($5,000), net due and deferred premiums ($65,510.27), policy loans ($16,563.49), and miscellaneous expense adjustments ($3,963.93). The amount of the above assets ($324,494.11) less the liability for claims assumed by petitioner ($14,096) represents the net amount of assets ($310,398.11) received by petitioner exclusive of the insurance contracts.

[5] Respondent does not appear to dispute that this was the value of the insurance contracts. He does, however, in the alternative issues allege that $250,000 is allocable to the acquisition of a going business or goodwill and other intangibles having no ascertainable lives. We do not understand him to argue, though, that petitioner received $250,000 in consideration apart from the insurance contracts.

sideration of $1,960,398.11. The difference ($1,650,000) in the amount of consideration that respondent would include in petitioner's income and the amount of consideration included by petitioner is equal to the value placed on the insurance business reinsured and received by petitioner from Guaranty by the terms of the reinsurance agreement.

At the outset, although we are concerned here only with the tax incidence to the insurer, we think it useful to point out generally the tax consequences of an assumption reinsurance transaction to both the reinsurer and the reinsured. In the case of the reinsurer, it must take into income under section 809 (c) (1) the consideration it receives from assuming the liabilities under the reinsured insurance contracts and gets a deduction under section 809 (d) (2) for the net increase in its reserves brought about by its assumption of the reserves required by law to be kept in order to meet future claims on the reinsured insurance contracts. Conversely, in the case of the reinsured, it must take into income under section 809 (c) (2) its net decrease in reserves brought about by the reinsurer's assumption of those reserves and gets a deduction under section 809 (d) (7) for the consideration it paid the reinsurer for assuming the liabilities under the reinsured insurance contracts.

While there is no doubt that the provisions of subchapter L and of section 809, in particular, are extremely relevant to the tax consequences of the transaction in question, we must not allow them to cloud the more basic issues that are faced in the instant case. Such a misfortune can easily befall us if we are not careful to look behind the labels attributed to the transaction by those sections of the Code, and by the technical vernacular used in the insurance profession. Thus, we must endeavor to isolate and identify the economic realities inherent in this specific set of circumstances, and to determine the tax consequences of those phenomena as intended by Congress with its enactment of subchapter L.

Certainly it is clear from the language of the agreement between petitioner and Guaranty, and from the general nature of the transaction underlying the agreement, that the reinsurance of the Skyland policies together with the transfer of designated real property and other tangible assets was tantamount to a sale transaction. Assuming a bona fide arm's-length transaction, it is logical to believe that each party received consideration equal to the value it bestowed upon the other. This supposition is readily supported by the findings of fact.

Petitioner bought specific assets and the Skyland business for the stated purchase price of $1,800,000. However, the agreement connotes a desire on the part of both petitioner and Guaranty to complete the sale with a minimum amount of money or other assets actually passing directly between the parties. The realization of this objective was

facilitated by the presence of a large pool of assets, the Skyland policy reserves, in the possession of Guaranty, but in an economic sense belonging to neither Guaranty nor petitioner. Hence, the purchase price was paid by crediting taxpayer with the total amount of liabilities or reserves it assumed when it received the assignment of the Skyland policies.

It is obvious that this credit was a consideration received by taxpayer for assuming the liabilities. This is particularly apparent from the fact that the parties agreed to pay, by one or the other, any amount by which the reserves required were less than or exceeded $1,800,000. Moreover, Guaranty actually paid petitioner in cash and other credits, the full amount by which the reserves exceeded the purchase price.

The outcome of this procedure was to free the reserves that Guaranty had previously collected from premiums and held to meet its obligations under the Skyland policies as the death claims became due. As a result, the major portion of the purchase price for the sale was realized by Guaranty by the release to it of the Skyland reserves and the substitution by petitioner of a like amount of reserves from its surplus. This was accomplished by each company simply making a few adjustments to its books, viz, petitioner reduced its surplus accounts and increased its reserve accounts by $1,650,000, while Guaranty reduced its reserve account and increased its income by the same amount.

Had the transaction been handled without the use of credits, on a strictly cash basis, it is assumed that taxpayer would have paid Guaranty $1,800,000 cash in return for not only the tangible assets and insurance contracts purchased, but also the required reserves previously accumulated from premiums on the policies. Obviously, Kentucky Central would not have been willing to pay $1,800,000 for the Skyland business and also to transfer $1,960,398.11 from its surplus account to set up reserves for those policies. This would, in effect, amount to a payment of $3,760,398.11 in exchange for insurance business assets worth approximately $1,800,000.

As the sale worked out, taxpayer succeeded in making the purchase of the Skyland business without having to transfer any sizable amounts of cash or other assets as consideration for its new acquisitions. Additionally, Kentucky Central has attempted to avail itself of the deduction created by section 809(d)(2), for increasing its reserves as part of the sale, without recognizing, coincidently, the consideration it received from Guaranty in the form of credits for the reserves. Should petitioner's argument prevail, we would, in effect, be allowing it a current loss deduction for $1,650,000 of the purchase price it indirectly paid Guaranty. Such could not have been the intendment of section 809 when enacted by Congress.

There apparently is no case law that deals specifically with the issue at hand. Moreover, the legislative history is of little or no help to us. Consequently, we must proceed, as best we can, to try to determine what Congress did intend to include in the "other consideration" of section 809(c)(1), taking all relevant factors into consideration. In doing so, we are forced to look beyond the specific language of section 809, to the general congressional intent which brought about the enactment of subchapter L. It is also appropriate that we consider the validity of taxpayer's argument under the general principles of Federal taxation and in light of our background and experience in Federal tax law.

A study of the history regarding the taxation of life insurance companies in the United States will clearly reveal the motivation behind the enactment of subchapter L in 1954, and its subsequent amendment in 1959, as being primarily concerned with increasing the Federal tax revenues derived from the operation of the domestic insurance companies. H. Rept. No. 34, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 736; S. Rept. No. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 770.[6] This is because the revenues from the companies under pre-1954 taxation procedures had been notoriously inadequate. Accordingly, subchapter L has been structured so as to clearly identify the day-to-day operations of the companies and to tax the various types of profits resulting therefrom, i.e., investment income, underwriting income, etc. Thus, the special treatment given insurance companies under the provisions of subchapter L is not predicated upon the idea of affording them an extra tax break, but to the contrary, is designed to make them more clearly reflect, for purposes of taxation, the income they generate from the unique method of their operations.

To allow petitioner the benefit of the section 809(d)(2) deduction for the increase in its reserves necessitated by the sale transaction, without also imputing premium income to it under section 809(c)(1) for the credit it received on the purchase price of the Skyland business, would produce a gross distortion in taxpayer's income, a windfall tax benefit, which is not in keeping with the purpose of subchapter L. Furthermore, this Court has previously dealt with the assumption of liabilities in an insurance setting and imputed income to petitioner from a reinsurance agreement. *International Life Insurance Co.*, 51 T.C. 765 (1969). Although that case may be distinguishable from the instant case on its facts, the basic rationale of the decision is nevertheless applicable. Therefore, we are firmly convinced that Congress

---

[6] See also Kaufman, "Life Insurance Company Income Tax Act of 1959—An Appraisal of the Effects on the Life Insurance Industry," 16 and 17 Nat. Tax J. 337–340 (1963 & 1964).

intended the phrase, "and consideration in respect of assuming liabilities under contracts not issued by the taxpayer," in section 809(c)(1) to serve as a catchall for transactions such as the one herein.

We find little merit in taxpayer's argument that the congressional committee reports support his position by their recognition that the cost of placing new policies on the company books is high in the first years and consequently small companies might experience underwriting losses in their early years. Those congressional comments were obviously directed to the day-to-day cost of putting new business on the books through direct sales by agents. Moreover, it is difficult to imagine small new companies with sufficient excess surplus to enable them to reinsure a large block of insurance as was done in the case at bar.

Taxpayer also places undue weight on an example in the Income Tax Regulations which it claims reaches a result that supports its position herein under similar circumstances.[7] See sec. 1.817–4(d)(3), Income Tax Regs. Because in the example no amount was included in the reinsurer's income for the value of the insurance business transferred, petitioner claims no amount should be included in its income for the value of the business it received in this transaction. We are not impressed with the argument for two reasons. In the first place, we are not concerned with the value of the insurance business ceded *per se*. We are concerned with an *amount* equivalent to the value of the business, but only because that is the amount taxpayer failed to report as income. Another reason we are unpersuaded by petitioner's analogy is that the example in the regulations does not give enough of the relevant facts and is thus misleading. The example leaves us uninformed as to what value was placed on the reinsured business and whether the reserves for the policies were transferred in the transaction. It seems logical to assume the only reason the reinsured would pay the reinsurer the $75,000 in cash would be to establish the required reserves for the policies ceded, but we will not make such an assumption on the facts as presented in the example. Furthermore, the result

---

[7] Ex. 1, sec. 1.817–4(d)(3), Income Tax Regs., is as follows: On June 30, 1959, X, a life insurance company, reinsured a portion of its insurance contracts with Y, a life insurance company, under an agreement whereby Y agreed to assume and become solely liable under the contracts reinsured. The reserves on the contracts reinsured by X were $100,000. Under the reinsurance agreement, X agreed to pay Y a consideration of $75,000 in cash for assuming such contracts. Assuming no other insurance transactions by X or Y during the taxable year, and assuming that X and Y compute the reserves on the contracts reinsured on the same basis, X has income of $100,000 under sec. 809(c)(2) as a result of this net decrease in its reserves and a deduction of $75,000 under sec. 809(d)(7) for the amount of the consideration paid to Y for assuming these contracts. Y has income of $75,000 under sec. 809(c)(1) as a result of the consideration received from X and a deduction of $100,000 under sec. 809(d)(2) for the net increase in its reserves.

reached by the example and the preceding regulations can be read to support respondent's position if we decide that section 809(c)(1) consideration includes credits given a reinsurer for liabilities it assumes in a reinsurance transaction.

For these reasons, we hold that petitioner received $1,650,000 additional consideration which is taxable to it as premium income under section 809(c)(1), from its reinsurance of Guaranty's Skyland division business.

Having determined that petitioner did receive $1,650,000 in additional premium income from the reinsurance arrangement, we turn now to respondent's argument that $250,000 of the Skyland purchase price should be attributed to goodwill and therefore such amount cannot be amortized under section 809(d)(12) as a deferred expense. We cannot agree with respondent's contention.

Upon perusal of all the evidence adduced at trial we can find nothing to support respondent's determination that the transfer of the Skyland business included goodwill. Petitioner's evidence indicates that the agreed-upon value for the Skyland business was arrived at by use of a mathematical formula and arm's-length bargaining and that the parties did not discuss nor consider goodwill. Respondent offered no evidence to show why he determined that a part of the purchase price should be allocated to goodwill or how he arrived at the amount to be allocated. Furthermore, there was no transfer of the company name and no evidence of a covenant not to compete. We must conclude from the evidence that the parties did not mention or consider goodwill in the agreement or elsewhere.

The $1,800,000 sales price to Guaranty was based on the use of a formula for valuing the future expected profits that the insurance business, then on the books, would produce. There appears to be no disagreement that this figure approximated $1,650,000. If the value of the real property and other tangible assets transferred as part of the arrangement is added to the $1,650,000 figure, the sum is clearly sufficient to compensate the $1,800,000 purchase price, without the consideration of goodwill. Thus, to find goodwill was included in the transaction would require a finding that the other assets were sold for less than their established value. Being unwilling to do this, we therefore hold that there was no goodwill purchased in the transaction and the entire amount of the purchase price attributable to the life insurance business and the other assets may be amortized or depreciated by petitioner, where allowable.

In the notice of deficiency, respondent determined that petitioner is entitled to an amortization deduction for a portion of the consideration which it received under the reinsurance agreement with Guar-

anty.[8] The respondent's computations indicate that the total amount to be amortized is $1,400,000, or $1,650,000 less the $250,000 he allocated to goodwill. On brief, respondent reaffirmed his allowance of the section 809 (d) (12) amortization deduction, citing section 1.817–4(d), Income Tax Regs., as authority in support of his determination. On brief, petitioner seems to have some doubt as to the availability of an amortization deduction under the circumstances here involved, but agrees with respondent that if the value of the insurance business transferred is to be included in petitioner's income, such amount should be amortizable by petitioner to avoid distortion of petitioner's income. Because both parties agree that an amortization deduction is allowable under the circumstances we find it unnecessary to decide that question in this case. Where our conclusion on the first issue necessarily involves recognition of the fact that petitioner paid Guaranty $1,650,000 for the Skyland insurance business, it is not unreasonable to assume that section 1.817–4(d) of the regulations is applicable in these circumstances and permits a deduction for amortization of the cost [9] of such business. We will accept respondent's determination that the regulations are applicable here, our only modification being that the full $1,650,000 purchase price is amortizable, since we have concluded above that there was no goodwill purchased in the transaction. This leaves to us for decision only the period over which the cost is amortizable.

There is some disagreement between petitioner and respondent as to the appropriate amortization period for the consideration paid for the Skyland business. Petitioner maintains the expense should be amortized in the year in which each policy lapses. Alternatively, taxpayer asserts that its expense incurred to acquire the industrial life policies and the ordinary life business should be amortized, on an average life basis, over periods of 6 years and 9 years, respectively. Respondent, on the other hand, has determined the expense should be written off over a 12-year period. Although there apparently is no clearcut answer to which of the proposed amortization schedules is most reasonable in petitioner's situation, we are inclined to feel that petitioner's alternative position is the most appropriate.

Petitioner's primary position is untenable for several reasons, the chief one being its utilization of hindsight to determine what, in fact,

---

[8] "It is determined that you are entitled to an amortization deduction for a portion of the consideration which you received under your reinsurance agreement with Guaranty Savings Life Insurance Company, computed as follows:

| | |
|---|---|
| Consideration received from Guaranty Savings Life Insurance Company | $1, 650, 000. 00 |
| Less: Unamortizable portion, going business cost, managers, agents, organization, etc | 250, 000. 00 |
| Net amount | 1, 400, 000. 00 |
| 1,400,000 ÷ 12 (estimated life of policies) | 116, 666. 67" |

[9] We will refer to the amount as "cost." The regulation permits the reinsurer to treat the amount paid to the reinsured in an assumption reinsurance transaction as a deferred expense and amortize it over the reasonably estimated life of the contracts reinsured.

502

the actual lapse periods of the policies were. By its very nature amortization is an advance estimate of the proper period for writing off an expense, which is calculated before all of the facts are known. See *Inter-City Television Film Corp.*, 43 T.C. 270 (1964). Consequently, we would be affording petitioner an advantage over other taxpayers should we allow it to determine its own amortization period in retrospect. Cf. *Manhattan Co. of Virginia, Inc.*, 50 T.C. 78 (1968). Furthermore, even if life insurance contracts should be entitled to different treatment, the evidence is insufficient to determine the cost attributable to each lapsed policy even were we to accept petitioner's plan.

We are also unable to accept respondent's argument that petitioner should not be allowed to write off the lapsed policies on an average life basis. With respect to this issue, respondent contends that a 12-year amortization period is most appropriate. However, we can find no explanation by respondent to inform us of the basis for his position. Since all of the policies would not be expected to expire simultaneously, obviously respondent's 12-year figure must be based on an arbitrary estimate or an average of some sort. If this is so, his position supports the use of an estimated life based on the average useful lives of the Skyland policies.

While respondent's regulations, sec. 1.817-4(d)(2)(iii), define the term "reasonably estimated life" as the "period during which the contract reinsured remains in force" based on the facts in each case, such as the age, health, and sex of the insured, etc., it seems clear that this definition is useful when one or a few life insurance contracts are reinsured, but would be impractical when a great many contracts are involved, as here. Furthermore, there is no indication that respondent observed this definition in making his determination. The more reasonable approach would seem to be to allow amortization over the estimated average life of the contracts included in the various components of the insurance business reinsured rather than over the estimated life of each individual contract. See *Manhattan Co. of Virginia, Inc., supra*, where this Court adopted such a procedure under somewhat similar circumstances.

With no data to sustain his own determination of a 12-year amortization period, respondent has yet failed to produce any countervailing evidence to rebut the estimates made by petitioner's expert witness. In light of the evidence that we do have, then, we are persuaded to adopt petitioner's amortization schedule of 6 years for the industrial life policies and 9 years for the ordinary life policies.

In the notice of deficiency, respondent made an allocation of the $1,650,000 among the various types of policies that constituted the

Skyland business.[10] In the absence of any evidence that respondent's allocation was not reasonable, we adopt his determination for purposes of amortizing the allowable portion, noting that the portion of the amount attributed to the "Industrial accident and health, cancellable" insurance policies cannot be amortized. *International Life Insurance Co., supra.*

*Decision will be entered under Rule 50.*

---

[10] Respondent's allocation in adjustment (7) on p. 10 of the notice of deficiency was as follows:

| | |
|---|---:|
| Nonparticipating ordinary | $820, 052. 88 |
| Nonparticipating industrial | 828, 352. 31 |
| Industrial accident and health, cancellable | 1, 594. 81 |
| | 1, 650, 000. 00 |