UNION BANKERS INSURANCE COMPANY, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

UNION BANKERS INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 934-71, 935-71, 8861-72. Filed August 6, 1975.

*Larry L. Bean* and *Vester T. Hughes, Jr.,* for the petitioners.
*Samuel W. Graber,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in Federal income tax of Union Bankers Insurance Co. and its liability as transferee of Bankers Service Life Insurance Co. for Federal income tax of that company as follows:

| Years | Amount of deficiency | Amount of liability |
|---|---|---|
| 1963 | | $180,672.80 |
| 1/1/64 to 6/30/64 | | 12,221.85 |
| 1960 | $32,607.83 | |
| 1963 | 304,562.30 | |
| 1964 | 95,733.05 | |
| 1965 | 172,293.70 | |
| 1966 | 13,698.90 | |
| 1967 | 129,372.16 | |

The parties have disposed of some of the issues raised by the pleadings by agreement, leaving for our decision the following:

(1) Whether Union Bankers Insurance Co. received a constructive taxable dividend when its subsidiary, Bankers Service Life Insurance Co., purchased shares of Union Bankers' stock from a corporation which was controlling shareholder of Union Bankers;

(2) Whether Bankers Service Life Insurance Co. or Union Bankers Insurance Co. or both through the purchase by Bankers Service of the Union Bankers' stock from Union Bankers' controlling shareholder, made distributions within the meaning of section 815, I.R.C. 1954,[1] resulting in life insurance company taxable income; and

(3) Whether Union Bankers Insurance Co. is entitled to amortize the cost of acquiring blocks of accident and health insurance in force from other insurance companies by assumption reinsurance agreements.

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time of filing its petitions in this case petitioner, Union Bankers Insurance Co. (Union), was a life insurance company organized under the laws of the State of Texas with its principal place of business at Dallas, Tex. Union filed its corporate tax return for its taxable year 1960 and its life insurance company income tax returns for its taxable years 1961, 1962, 1963, 1964, 1965, 1966, and 1967 with the District Director of Internal Revenue for Dallas, Tex.

Bankers Service Life Insurance Co. (Bankers) was a life insurance company organized under the laws of the State of Oklahoma. It filed its life insurance company income tax return for its taxable year 1963 with the District Director of Internal Revenue for Oklahoma City, Okla.

### 1. *Distribution*

General Insurance Investment Co. (General) is a Texas corporation organized under and subject to the Texas Business Corporation Act.

On August 19, 1963, General owned 31.5 percent of the common stock, 84.2 percent of the class A voting preferred stock, and approximately 100 percent of the class B preferred stock of Union. On or after August 19, 1963, Union acquired approximately $53\frac{1}{2}$ percent of the outstanding capital stock of Bankers, and General acquired approximately $32\frac{1}{2}$ percent of the outstanding capital stock of Bankers.

On or about August 21, 1963, Bankers acquired 134,000 shares of Union's class B preferred stock from General. On or about December 30, 1963, Bankers acquired an additional 6,000 shares of Union's class B preferred stock from General.

Neither Union nor Bankers on their 1963 income tax return reported any income from the purchase by Bankers of the Union stock from General.

Respondent in his notice of liability to Union as successor and transferee of Bankers determined that Union was liable for a deficiency in Bankers' tax in the amount of $180,672.80 for its calendar year 1963 resulting in part from an increase in Bankers' life insurance company taxable income in the amount of

$421,534.61. Respondent explained this increase as being a charge to Bankers' policyholders surplus account because of distributions by Bankers within the year 1963, based on respondent's determination that the payment of a cash dividend by Bankers to Union in the amount of $289,751.80 and the purchase by Bankers of 140,000 shares of class B preferred stock issued by Union for the amount of $1,132,932.15 resulted in distributions by Bankers to Union in the total amount of $1,422,683.95 for the taxable year 1963 which was chargeable to Bankers' shareholders surplus account to the extent thereof as of the close of its taxable year in the amount of $266,511.14, to Bankers' policyholders surplus account to the extent thereof at the close of its taxable year in the amount of $421,534.61, and to other surplus accounts of Bankers in the amount of $734,638.20.

Respondent in his notice of deficiency to Union determined that the purchase from General by Bankers of 140,000 shares of Union class B preferred stock resulted in a distribution of an ordinary dividend by Bankers to Union to the extent of Bankers' earnings and profits available for distribution. This determination resulted in increasing dividends received by Union from Bankers by the amount of $298,002.81. Union's share (the total less policyholders' share) of this amount less Union's share of the corporate dividends received deduction was included in Union's life insurance company taxable income. Further, respondent determined that Union made distributions during the taxable year 1963 in the amount of $1,581,826.32 of which the amount of $1,132,932.15 was a distribution by Union to General through the sale of preferred class B Union shares by General to Bankers. Respondent charged the total amount of distributions made during the taxable year 1963 to Union's shareholders surplus account to the extent thereof at the close of its taxable year in the amount of $733,063.06 and to Union's policyholders surplus account to the extent thereof at the close of its taxable year in the amount of $471,328.38. The balance of distributions in 1963 was charged to other surplus accounts in the amount of $377,434.88. Respondent included the amount of $471,328.38, the amount by which Union's policyholders surplus account was reduced, in Union's life insurance company taxable income for 1963.

## 2. *Amortization*

In the insurance industry, accident and health insurance may be classified, generally, as cancelable, noncancelable, or guaranteed renewable. A cancelable accident and health insurance policy is one which the insurance company may refuse to renew or extend the insurance coverage to the insured. Its term is usually 12 months. A noncancelable accident and health insurance policy is one which the insurance company is under an obligation to renew or continue the insurance coverage at a specified premium. Under this type of policy the insured is compensated at fixed rates for specified periods of time for his loss of time from work and hospitalization costs in the event of the insured's accidental injury or illness. A guaranteed renewable accident and health insurance policy is one which the insurance company may not cancel but under which the company reserves the right to adjust the premium rates by classes in accordance with its experience under the type of policy involved.

Union purchased various blocks of accident and health insurance in force from other insurance companies pursuant to reinsurance agreements and paid a premium to the ceding company to purchase such existing business. The date of the acquisitions, the ceding companies, the premium paid for such insurance in force, the approximate relative percentage of each type of accident and health insurance policies remaining in force at stated times, and the approximate percentage of the total number of policies remaining in force at stated times are as shown in the table on pages 812-813.

| | | | As of | | | | | December 31— | | | | | | |
| Ceding company | Date of purchase | Amount of premium paid | date of purchase | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969[1] | 1970 | 1971 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Republic Bankers Life Ins. Co.[2] | 12/31/58 | $47,890.53 | | | | | | | | | | | |
| Percentage by type: | | | | | | | | | | | | | |
| Noncancelable | | | 17.44 | 17.46 | 17.66 | 17.72 | 18.23 | 18.50 | 16.67 | 19.82 | 21.32 | 22.54 | 21.11 |
| Guaranteed renewable | | | 2.74 | 2.73 | 3.17 | 3.32 | 3.79 | 3.51 | 0 | 6.45 | 9.64 | 10.40 | 10.46 |
| Other | | | 79.82 | 79.81 | 79.17 | 78.96 | 77.98 | 77.99 | 83.33 | 73.73 | 69.03 | 67.05 | 68.63 |
| Total percentage in force | | | 100.00 | 31.64 | 27.25 | 23.75 | 20.82 | 16.05 | 10.82 | 8.15 | 7.40 | 6.50 | 5.75 |
| Old Capitol Life & Accident Ins. Co.[2] | 1/12/59 | 496,906.99 | | | | | | | | | | | |
| Percentage by type: | | | | | | | | | | | | | |
| Noncancelable | | | 41.54 | 41.54 | 42.60 | 43.47 | 44.00 | 45.56 | 51.72 | 62.05 | 55.40 | 54.91 | 55.26 |
| Guaranteed renewable | | | 30.19 | 30.19 | 28.76 | 28.04 | 27.24 | 25.16 | 21.20 | 24.17 | 30.61 | 31.24 | 30.82 |
| Other | | | 28.27 | 28.27 | 28.64 | 28.49 | 28.76 | 29.28 | 27.08 | 13.78 | 13.99 | 13.85 | 13.92 |
| Total percentage in force | | | 100.00 | 26.55 | 23.35 | 21.19 | 19.01 | 15.81 | 13.00 | 9.68 | 10.29 | 9.16 | 8.27 |
| Reliance National Life Ins. Co. | 8/1/60 | 185,528.43 | | | | | | | | | | | |
| Percentage by type: | | | | | | | | | | | | | |
| Noncancelable | | | .06 | .06 | .06 | .06 | .07 | .09 | .13 | .20 | .20 | .23 | .27 |
| Guaranteed renewable | | | 3.04 | 3.05 | 3.73 | 3.84 | 3.89 | 3.98 | 5.10 | 8.10 | 16.47 | 18.05 | 19.46 |
| Other | | | 96.89 | 96.89 | 96.21 | 96.10 | 96.03 | 95.93 | 94.77 | 91.70 | 83.33 | 81.71 | 80.27 |
| Total percentage in force | | | 100.00 | 40.58 | 34.42 | 29.99 | 26.60 | 21.19 | 15.03 | 9.47 | 9.66 | 8.28 | 7.09 |
| Universal Guaranty Ins. Co.[3] | 1/1/62 | 409,320.79 | | | | | | | | | | | |
| Percentage by type: | | | | | | | | | | | | | |
| Noncancelable | | | 1.67 | 1.67 | 1.81 | 1.90 | 1.98 | 2.15 | 2.12 | 2.57 | 2.43 | 2.74 | 2.67 |
| Guaranteed renewable | | | 3.08 | 3.08 | 2.69 | 2.51 | 2.45 | 2.35 | 2.07 | 2.25 | 14.02 | 14.27 | 14.10 |
| Other | | | 95.25 | 95.25 | 95.50 | 95.59 | 95.57 | 95.50 | 95.80 | 95.18 | 83.54 | 82.99 | 83.23 |
| Total percentage in force | | | 100.00 | 78.48 | 65.90 | 58.39 | 52.25 | 40.18 | 30.14 | 20.85 | 21.12 | 17.89 | 15.62 |

| Ceding company | Date of purchase | Amount of premium paid | As of date of purchase | December 31— | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969[1] | 1970 | 1971 |
| Bankers Service Life Ins. Co[4] | 10/1/63 | $1,270,288.92 | | | | | | | | | | | |
| Percentage by type: | | | | | | | | | | | | | |
| Guaranteed renewable | | | 100.00 | 0 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| Total percentage in force | | | 100.00 | 0 | 87.54 | 69.83 | 60.75 | 47.26 | 37.70 | 28.85 | 28.53 | 25.55 | 23.41 |
| Old National Ins. Co[5] | 4/15/65 | 590,418.27 | | | | | | | | | | | |
| | 9/1/65 | 12,776.57 | | | | | | | | | | | |
| Percentage by type: | | | | | | | | | | | | | |
| Noncancelable | | | 21.59 | 0 | 0 | 0 | 22.42 | 25.01 | 25.97 | 28.88 | 30.67 | 32.03 | 32.85 |
| Guaranteed renewable | | | 60.11 | 0 | 0 | 0 | 59.43 | 56.30 | 49.82 | 50.39 | 50.06 | 48.59 | 47.70 |
| Other | | — | 18.30 | 0 | 0 | 0 | 18.15 | 18.69 | 24.21 | 20.73 | 19.27 | 19.38 | 19.45 |
| Total percentage in force | | | 100.00 | 0 | 0 | 0 | 87.52 | 72.51 | 59.52 | 50.45 | 48.84 | 44.73 | 41.73 |
| State Ins. Co. of Tennessee[6] | 5/16/66 | 934,200.00 | | | | | | | | | | | |
| Percentage by type: | | | | | | | | | | | | | |
| Noncancelable | | | .07 | 0 | 0 | 0 | 0 | .13 | .08 | .11 | .12 | .13 | .15 |
| Guaranteed renewable | | | 99.93 | 0 | 0 | 0 | 0 | 99.87 | 94.60 | 99.89 | 99.79 | 99.84 | 99.82 |
| Other | | | 0 | 0 | 0 | 0 | 0 | 0 | 5.32 | 0 | .09 | .03 | .03 |
| Total percentage in force | | | 100.00 | 0 | 0 | 0 | 0 | 46.13 | 42.29 | 31.26 | 29.05 | 25.55 | 22.88 |

[1] The percentage of the total number of policies in force and the percentage of the relative types of policies in force are slightly distorted due to Medicare endorsements issued on existing policies which were treated as new policies and to changes in policy codes so that a particular policy previously classified as one type became classified as another.

[2] Prior to Dec. 31, 1962, actual figures were available only for total monthly premium in force. Consequently, the relative percentages of the types of insurance in force before Dec. 31, 1962, were actuarily calculated on the basis of the average premium per policy and the relative percentage by type as of Dec. 31, 1962.

[3] Actual figures were available for total policy count on Jan. 1, 1962. Consequently, the relative percentages of the types of insurance in force on Jan. 1, 1962, were determined on the basis of the relative percentage by type on Dec. 31, 1962.

[4] Although Union converted to guaranteed renewable, the Bankers' insurance policies in force that it acquired which were cancelable, Union maintained a statistical analysis that characterized a significant number of policies after their acquisition as other than guaranteed renewable and noncancelable which we disregarded.

[5] These figures are based on the acquisitions of Apr. 15 and Sept. 1, 1965. Prior to Dec. 31, 1965, actual figures for policy count by type were available only for the acquisition of Apr. 15, 1965. Consequently, the percentage of the policy count by type for both acquisitions was actuarily calculated on the basis of percentage of policy count by type of the acquisition of Apr. 15, 1965.

[6] Union converted the cancelable policies in force that it acquired in this transaction to guaranteed renewable.

In each acquisition Union assumed all liabilities and risks under the policies and issued a certificate of assumption to the policyholder reflecting the reinsurance transaction.

During the years in issue, the State of Texas did not require that a reserve in addition to an unearned premium reserve be established with respect to noncancelable and guaranteed renewable accident and health insurance. Union did not establish reserves in addition to unearned premium reserves in connection with any of the blocks of insurance acquired which it classified as noncancelable or guaranteed renewable business or with respect to cancelable business which it made guaranteed renewable.

In acquiring these eight blocks of insurance in force, Union paid an amount equal to approximately half of their total annualized premium or six times the monthly premium in force, adjusted for any commissions still payable on the policies it bought, an excessive ratio of losses to premiums and unearned premium reserves transferred.

In buying blocks of policies in force Union gave no consideration to the right to the name of the insurance company from which it acquired policies in force nor did it obtain such right. Further, Union did not seek to employ individuals who were working for insurance companies from which it acquired blocks of insurance, although some former employees of these insurance companies did come to work for Union after it had acquired the blocks of insurance.

The insurance companies other than Republic Bankers Life Insurance Co. from which Union acquired the eight blocks of insurance, either eventually merged or liquidated into Union or discontinued their accident and health insurance business. In each instance these companies ceased to compete with Union. However, Republic Bankers Life Insurance Co. which sold a block of their accident and health insurance business to Union needed the capital at that time and continued to compete with Union in selling accident and health insurance.

Although it is necessary to be licensed by a State insurance commission to transact insurance business within a State, it is not essential to have a license in acquiring a block of insurance by a reinsurance agreement and servicing that business.

There infrequently are inquiries to the ceding insurance company from holders of policies which have been sold pursuant to reinsurance agreements. In such an event the ceding insurance

company that receives an inquiry from one of its former policyholders with regard to a renewal, endorsement, or claim generally will forward the inquiry to the reinsuring company or refer its former policyholder to the reinsuring company. However, if a former policyholder of a ceding company were to request information concerning buying insurance from the ceding company which provided no basis for the ceding company to realize that it had ceded this business, the inquiry would be referred by the ceding company to its agency force, if it has one, as a prospect.

Union primarily acquired individual accident and health insurance policies and some family group accident and health insurance policies in its reinsurance transactions. Family group policies terminate coverage of a dependent upon his reaching the age of 18, but such dependent may under a convertability provision in a family group policy be issued a policy in his own name.

Union claimed deductions for amortization of the premium paid with respect to reinsuring blocks of insurance based on a 7-year life with 20 percent deducted in the first year and equal deductions of the remaining balance in the succeeding 6 years. Its determination of the useful life of a block of insurance was based on its view of industry experience, its own experience, and its use of a 7-year life in gauging the performance of a block of business it had acquired to determine if Union would realize the profits it anticipated at the time it bought the business in force.

Union never exercised its right to cancel the cancelable policies that it acquired by the reinsurance agreements and its policy was, where feasible, to convert its cancelable policies to guaranteed renewable. The cancelable policies it acquired from Bankers and State Insurance Co. of Tennessee pursuant to reinsurance agreements were converted by Union to guaranteed renewable at the time they were acquired.

The term "lapse" as it is applied to accident and health insurance is generally understood in the insurance industry to mean the failure of a policy or one into which it is converted to continue in force because of the unforeseeable termination of the policy or converted policy by the insured. This results from the insured's voluntary or involuntary nonpayment of premium. Lapse studies are statistical analyses of failure of a policy to continue in force for whatever reason during an interval of time.

Persistency and persistency studies are the complements to lapse and lapse studies.

Each policy form has a unique rate of lapse. Based on the insureds' occupations, geographical locations of residence, and annual incomes, and the methods including reinsurance transactions by which the insureds were solicited, the rate of lapse of a group of a specified kind of accident and health policies, hospitalization, hospitalization and surgical, disability income or accidental injury, may be statistically projected with reasonable certainty. If these factors are unavailable with respect to a block of insurance in force, lapse rates may be determined from a statistical analysis of actual past experience of policies in force at specified intervals of time or from an informed judgment of a person who has had experience in the field.

In the accident and health insurance business generally a block of accident and health insurance in force has an average rate of lapse of from $3\frac{1}{2}$ to $5\frac{1}{2}$ years. Whether the average rate of lapse tends toward $3\frac{1}{2}$ or $5\frac{1}{2}$ years depends on the various factors that tend to influence lapse rates. An average rate of lapse of 7 years for a block of accident and health insurance is greater than the average and the probability of an average rate of lapse exceeding 7 years is small, even considering unknown or estimated variables.

The lapse rate is higher in the earlier years of the policy especially where there has been a reinsurance transaction and an assumption certificate issued to a policyholder.

Lapse rates diminish as the service provided by an insurance company improves. Insurance companies generally attempt to determine the reason for the insured's voluntarily permitting the policy to terminate so that if the reason is of a nature that can be remedied by the company, the necessary action may be taken.

There are no generally accepted lapse or persistency tables for accident and health insurance in the insurance industry. Whether policies are in the nature of cancelable, guaranteed renewable, or noncancelable, or have reserves in addition to unearned premium reserves attributed to them does not affect lapse rates. But a particular insured is inclined to buy a certain type of accident and health insurance whether it is cancelable, guaranteed renewable, or noncancelable, and the insured's occupation, place of residence, income, and other factors peculiar to the insured do affect lapse rates. Due to these factors non-

cancelable policies generally have a longer life than guaranteed renewables, and guaranteed renewables a longer life than cancelable.

A block of insurance in force may be actuarily valued based on such factors as the renewal provisions, the policyholder's age at issue, the policy durations that remain in the block of business in force at the time of the valuation, the premium structure, the benefits provisions, an interest assumption, a discount assumption, overhead expenses, and lapse rates, the latter being a necessary element of the valuation. The value of a block of insurance in force is negligible after 10 years due to discount factors, including the lapse rate. These factors are considered by the purchaser and seller in negotiating the premium to be paid in acquiring accident and health policies in force, the price agreed upon usually being expressed as a multiple of the monthly premium in force.

Union claimed deductions for amortization of the premium paid in connection with each of the aforementioned reinsurance transactions on its Federal income tax returns for its taxable years 1960 to 1967, inclusive, as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1960 | $109,745.36 | 1964 | $384,839.19 |
| 1961 | 97,376.79 | 1965 | 410,739.26 |
| 1962 | 179,240.95 | 1966 | 339,519.23 |
| 1963 | 215,467.35 | 1967 | 304,373.95 |

Union claims additional deductions for amortization in the amounts of $124,506 and $145,320 for its 1966 and 1967 taxable years with respect to its acquisition of business from State Insurance Co. of Tennessee.

Respondent in his notice of deficiencies to Union disallowed the amounts of the above-claimed amortization deductions during 1960 through 1967 except for those with respect to the acquisitions from Universal Guaranty Insurance Co. and from Bankers for 1962, 1963, and 1964, as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1960 | $109,745.36 | 1964 | $97,376.79 |
| 1961 | 97,376.79 | 1965 | 410,739.26 |
| 1962 | 97,376.79 | 1966 | 339,519.23 |
| 1963 | 97,376.79 | 1967 | 304,373.95 |

Respondent explained that the cost of acquiring the accident and health policies is not deductible as a commission expense nor

amortizable as the taxpayer was a casualty company at the time it acquired the accident and health policies and it has not been shown that certain accident and health policies which were amortized were noncancelable or guaranteed renewable in accordance with Rev. Rul. 65-175, 1965-2 C.B. 41.

## OPINION

Union for its taxable years 1961 through 1967 and Bankers for its taxable year 1963 were life insurance companies within the meaning of section 801 and taxable under section 801 et seq. Union for its taxable year 1960 was an insurance company other than a life insurance company within the meaning of section 831 and was taxable under section 831 et seq. for that year.

The parties agree that Union pursuant to a statutory merger within the meaning of section 368(a)(1)(A) is the transferee at law of all of the assets and liabilities of Bankers, including its Federal income tax liabilities, and that the Federal income tax of Bankers for its taxable year 1963, if any, as determined by us may be assessed against Union as transferee.

The parties recognize that the acquisition by Bankers of the class B preferred stock of Union from General was governed by section 304(a)(2), agreeing that Union was in control of Bankers within the meaning of section 304(c).

Petitioners contend that, if a shareholder of a parent corporation sells shares of the parent's stock to a subsidiary corporation controlled by the parent, section 304(a)(2) creates a constructive distribution in redemption of the parent's stock from the parent to the selling shareholder for the sole purpose of prohibiting shareholders from bailing out corporation earnings at capital gain rates without running the gauntlet of sections 302(b) and 303. Consequently, petitioners argue this constructive distribution under section 304 results only for the purpose of applying section 302 in determining the nature of the gain to the selling shareholder and, in the event that the amount received would have been treated as a distribution of property under sections 302(d) and 301, of determining the amount which constitutes a dividend to the selling shareholder. Since a constructive distribution under section 304(a)(2) is merely a fiction utilized to remedy a specific tax-avoidance device, petitioners argue that section 304(a)(2) does not affect the determination of the tax consequences for the parent corporation and there is no inter-

corporate distribution from Bankers to Union which is a dividend to Union. Further, they contend there was no distribution within the meaning of section 815 from policyholders surplus accounts of Bankers to Union and from Union to General, generating a phase III tax to both of them. Alternatively petitioners argue if there were a distribution creating a phase III tax it was only from Bankers. Petitioners do not argue that respondent's computations with respect to amounts subtracted from the policyholders surplus account of Bankers and Union are inaccurate but argue that a distribution under section 815 must be a true redemption and that in any event Congress did not intend to include involuntary distributions which did not reduce the reserves for payment of policyholders' claims.

It is respondent's position that section 304(a)(2) treats the aforesaid transaction as a distribution in redemption of the stock of a parent corporation and that such treatment is not to be limited to determining the tax consequences at the shareholder level. Since the parent made a distribution in redemption of its stock under section 304 and the subsidiary in fact paid the amount of the parent's distribution, respondent argues that regardless of the treatment of distribution in redemption at the shareholder level, such distribution was a constructive dividend from the subsidiary to the parent to the extent of the subsidiary's earnings since this was the only manner by which the subsidiary could have financed the parent's redemption, relying on Rev. Rul. 69-261, 1969-1 C.B. 94. Respondent contends that a distribution from Bankers within the meaning of section 815 resulted from its constructive distribution to Union and a distribution from Union within the meaning of section 815 resulted from its distribution in redemption pursuant to section 304. Since the amounts of these and other distributions from Bankers and from Union during their respective taxable years exceeded the amounts within their respective shareholder surplus accounts at the close of their respective taxable years, respondent contends a phase III tax was triggered with respect to each of them to the extent of the amounts distributed from their respective policyholders surplus accounts.

Under the Life Insurance Company Income Tax Act of 1959, the provisions of which are contained in subchapter L, part I, sections 801-820, life insurance company taxable income under section 802(b) is determined by adding the amounts of taxable

income as determined in each of three phases. The first phase, taxable investment income, determines the amount of the life insurance company's share of its net investment income. The second phase, gains from operations, determines an amount equal to half of the amount of the life insurance company's share of gains from operations which mostly consist of underwriting gain, that is, mortality and loading savings. If the life insurance company's share of gains from operations exceeds its share of taxable investment income, then only the former amount is included under phases I and II. The third phase, tax on distributions of previously deferred underwriting gain, determines the amount of distributions by the life insurance company to shareholders in excess of previously taxed income. (Sec. 802(b).)

Under section 804(a)(2), phase I taxable investment income consists of the life insurance company's share of each and every taxable or nontaxable item of investment yield, which is defined under section 804(b) and (c) as the life insurance company's gross investment income which includes dividends received less certain investment expenses, reduced in part by the dividends received deduction determined with respect to the life insurance company's share of dividends received. "This reflects a recognition 'that life insurance companies are legally obligated to keep policyholder reserves in order to meet future claims, that they normally add a significant portion of their investment income to these reserves, and that these annual reserve increments should not be subjected to tax.'" (Citations omitted.) *Bankers Union Life Insurance Co.,* 62 T.C. 661, 670 (1974).

Under section 809(b), phase II gain from operations consists of the total gross receipts of the life insurance company, which in part includes the life insurance company's share of each and every item of investment yield which we have noted includes dividends received, reduced by certain deductions under section 809(d) including the dividends received deduction determined with respect to the life insurance company's share of dividends received. Since the amount of taxable investment income has already been included in life insurance taxable income under phase I, such amount is deducted from the amount of the gains from operations and one-half of the balance is included in life insurance taxable income under phase II. The inclusion of only half of the gains from operations in life insurance company taxable income and conversely the deferral of tax for the other

half recognizes the difficulty in determining true underwriting gains on an annual basis because of the long-term and contingent nature of life insurance contracts.

The life insurance company's share of investment yield is the balance after accounting for the policyholders' share, and the ratio of the policyholders' share of investment yield to the investment yield determines the percentage that is applied to each item of investment yield which results in an amount representing the amount of an item excluded. The policyholders' share under phase I and phase II is computed somewhat differently. Under phase I the policyholders' share is determined by dividing the company's investment yield by the assets of the company. This percentage, which is subject to some downward modification if the percentage is lower in the prior 4 years, represents the actual earnings rate of the company and is applied to the amount of the company's adjusted life insurance reserves for policyholders. This amount plus certain additions for certain interest paid and pension plan trusts represents the amount excluded from the life insurance company's investment yield under phase I. Under phase II the policyholders' share of investment yield is calculated by applying the interest rates assumed by the company in setting up its reserves to the adjusted life insurance reserves for policyholders plus reserves for supplemental contracts without life contingencies. See *Jefferson Standard Life Insurance Co. v. United States,* 408 F.2d 842, 844-846 (4th Cir. 1969).

Under section 815 there is established for tax purposes two surplus accounts, a shareholders surplus account with a zero balance as of January 1, 1958, and a policyholders surplus account with a zero balance as of January 1, 1959. Any amounts remaining after payment of taxes under phase I, II, III, or long-term capital gains for each year from 1958 are added to the shareholders surplus account as well as certain otherwise nontaxed amounts including the full amount of the deduction for intercorporate dividends received. The policyholders surplus account largely represents the cumulative amount of the gains from operations from 1959 which have not been subjected to tax under phase II. The half of the underwriting gains which is not subject to tax under phase II, the deduction for nonparticipating policies, and the deduction for group insurance are added to the policyholders surplus account each year from 1959. Distributions

to shareholders by a life insurance company are treated as first being paid out of the shareholders surplus account to the extent of the cumulative balance thereof at the end of the taxable year computed without diminution for any distribution treated as made from this account during the taxable year, then from the policyholders surplus account to the extent of the cumulative balance thereof at the end of the taxable year computed without diminution for any distribution treated as made from this account during the taxable year, and then from other surplus. The accounts from which the distributions are deemed to have come are reduced (but not below zero) by the amount of the distributions and in the case of a distribution from the policyholders surplus account, by the amounts of tax which would have to be currently paid to leave amounts equal to that otherwise deemed distributed from the policyholders surplus account. The amounts of any distributions during a taxable year subtracted from the shareholders surplus account as of the close of the taxable year results in no tax consequences to the life insurance company since this account represents amounts on which the life insurance company has already paid taxes. The amounts of any distributions during a taxable year, including the related tax thereon, subtracted from the policyholders surplus account as of the close of the taxable year is included in the life insurance company taxable income in the taxable year of the distributions under phase III since the amounts distributed represent amounts that have not been subject to tax and for which the deferral of tax has been terminated. Distributions in excess of the cumulative balance as of the close of the taxable year of both these accounts have no tax consequences to the life insurance company.

Initially we must decide whether by virtue of section 304(a)(2) there results an intercorporate dividend from a subsidiary corporation to its controlling parent corporation to the extent of the subsidiary's available earnings in the amount of the consideration paid by the subsidiary in its purchase of shares of stock of its parent corporation from a shareholder of the parent corporation. More specifically the issue is whether under the provisions of section 304(a)(2) a subsidiary discharges an obligation of its parent when it purchases stock of its parent, thereby directly benefiting the parent corporation so that the parent receives a constructive dividend to the extent of the

subsidiary's available earnings. We conclude that under the provisions of section 304(a)(2) the subsidiary is deemed to have discharged the parent's obligation when it purchases its parent's stock from one of its parent's stockholders. It follows that when Bankers purchased stock of its parent, Union, from Union's stockholder, General, that Union did receive a constructive dividend to the extent of Bankers' earnings and profits by virtue of Union's having redeemed its own stock with the funds of Bankers pursuant to section 304(a)(2). *Union Stock Farms v. Commissioner*, 265 F. 2d 712, 725 (9th Cir. 1959), affg. in part and revg. in part on other grounds a Memorandum Opinion of this Court. See *Glenn E. Edgar*, 56 T.C. 717, 758 (1971).

Section 115(g) of the Internal Revenue Code of 1939 provided that if a corporation redeemed its own stock at such time and in such manner as to make the distribution and redemption essentially equivalent to the distribution of a taxable dividend then the amount so distributed in redemption of the stock, to the extent it represents a distribution of earnings, was treated as a taxable dividend. This section was amended in 1950 by adding section 115(g)(2), I.R.C. 1939, which is the substantially unchanged provision of section 304(a)(2). The purpose of the amendment was to extend the principles of section 115(g), I.R.C. 1939, which prevented the stockholder's drawing-off of corporate profits at capital gains rates by having the issuing corporation buy its stock, to an acquisition of stock by a corporation controlled by a corporation issuing the shares of stock which in effect resulted in the indirect redemption of the shares of the issuing corporation since the issuing corporation controlled the subsidiary corporation that purchased the stock of the issuing corporation.[2] This was intended to avoid the result reached in

---

[2] H. Rept. No. 2319, to accompany H.R. 8920, 81st Cong., 2d Sess. 53 (1950), states in part as follows:

"If the stockholders of a corporation which owns all the stock of a subsidiary corporation obtain cash from that subsidiary, in effect they have received a dividend to the same extent as would be the case if the cash had been paid by the subsidiary to the parent corporation and had then been distributed by the parent to the stockholders. And where such stockholders 'sell' part of their stock in the parent corporation to the subsidiary they nevertheless retain ownership and control of both corporations, since the 'sold' stock is one of the assets which the parent corporation owns by virtue of its possession of all the stock of the subsidiary. Therefore, section 207 of your committee's bill *amends section 115(g)* of the Internal Revenue Code, *so as to cover indirect redemption of shares in a parent corporation* through purchases by its subsidiaries. * * * [Emphasis supplied.]"

S. Rept. No. 2375, to accompany H.R. 8920, 81st Cong., 2d Sess. 82 (1950), states in part as follows:

*Rodman Wanamaker Trust*, 11 T.C. 365 (1948), affd. 178 F. 2d 10 (3d Cir. 1949), where this Court held that a wholly owned subsidiary's purchase of its parent corporation's stock from stockholders of parent did not result in a distribution to the shareholder substantially equivalent to a taxable dividend under section 115(g)(1), I.R.C. 1939, since the subsidiary did not redeem its own stock, even though, if the parent corporation had directly redeemed its stock, the redemption would have been a distribution of its earnings that was essentially equivalent to the distribution of a dividend.

Plainly the device of selling the parent's stock to its subsidiary to take advantage of the benefits of capital gains rates which indirectly operated as a redemption of the parent's stock that if done directly would have been taxed as a dividend, being a distribution in redemption that was essentially equivalent to a dividend, was prohibited under section 115(g)(2), I.R.C. 1939, by treating the parent as if it had redeemed its own stock directly from its shareholders and examining the redemption under section 115(g)(1), I.R.C. 1939, to determine the tax consequences to the selling shareholder. The Internal Revenue Code of 1954 incorporated this rule of characterizing transactions which are in form purchases by a subsidiary as distributions in redemption of the parent's stock in section 304(a)(2) [3] and supplemented it by section 304(b)(2)(B) [4] although the Ways and Means Committee

----

"The amendment made by this section of the bill would add a new paragraph (2) to section 115(g) of the code to require the application of the principles of section 115(g) in the case where the acquisition of stock is made by a corporation controlled by the issuing corporation.

"Under the amendment, where stock of a parent corporation is acquired by a subsidiary, *the amount paid for the stock is treated, for the purposes of section 115(g)(1), as though such amount had been distributed by the subsidiary to the parent and had then been applied by the parent in redemption of its stock.* If the amount paid for the stock would, under those circumstances, be treated as essentially equivalent to the distribution of a taxable dividend by the parent under the principles of section 115(g)(1), the amount when paid by the subsidiary to a shareholder of the parent shall, to the same extent, constitute a dividend in the hands of such shareholder. * * * [Emphasis supplied.]"

[3] SEC. 304(a)(2). ACQUISITION BY SUBSIDIARY.—For purposes of sections 302 and 303, if—

 (A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and
 (B) the issuing corporation controls the acquiring corporation,
then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.

[4] SEC. 304(b)(2)(B). WHERE SUBSECTION (a)(2) APPLIES.—In the case of any acquisition of stock to which subsection (a)(2) of this section applies, the determination of the amount which is a dividend shall be made as if the property were distributed by the

proposed that the subsidiary be treated as having redeemed its own stock and the determination of the amount of dividend, if any, to the selling shareholder was to be made solely by reference to the earnings and profits of the subsidiary. See H. Rept. No. 1337, to accompany H.R. 8300, 83d Cong., 2d Sess. A79 (1954). The Senate Finance Committee explained the general rule of section 115(g)(2), I.R.C. 1939, which it adopted and Congress ultimately reenacted as section 304(a)(2), as follows:

> The general rule of present law, preserved in the parent-subsidiary area, is set forth in paragraph (2). Under this rule, supplemented by subsection (b)(2)(B), if a subsidiary corporation purchases outstanding stock of its parent the proceeds of such sale shall be considered to be first a distribution by the subsidiary to the parent and then immediately thereafter a distribution by the parent corporation in redemption of its own stock.

S. Rept. No. 1622, to accompany H.R. 8300, 83d Cong., 2d Sess. 239 (1954).

Section 304(a)(2) and its precursor were intended to prevent a shareholder from obtaining more favorable tax treatment by indirectly redeeming his shares in one corporation by selling them to that corporation's subsidiary than he would have obtained if the shares had been redeemed by the issuing corporation. The statutory remedy was to treat the parent corporation as if it had redeemed its own stock. Such a situation existed with respect to General's sale of Union's preferred stock to Bankers. Consequently both parties apparently agree, as we think they must, that, at least for purposes of determining the tax consequences with respect to General under section 302, Union is treated as having redeemed its own stock under section 304(a)(2). The question then becomes whether the statutory treatment of Union's redemption of its own stock with respect to General under section 304(a)(2) is to be construed to only apply to General and not to Union. We can find no basis for differentiating the tax treatment accorded the same transaction as between the selling shareholder, the parent corporation, and the subsidiary corporation. Section 304(a)(2) (and its related sections 302 and 317(b)) makes no such provision but in fact clearly provides that if a subsidiary corporation acquires shares of stock of its parent corporation from a stockholder of its parent for

---

acquiring corporation to the issuing corporation and immediately thereafter distributed by the issuing corporation.

property and the parent corporation controls the subsidiary, then for purposes of sections 302 and 303 the property distributed by the subsidiary shall be treated as a distribution in redemption of the stock of the parent corporation. Section 1.304-3(a), Income Tax Regs.,[5] provides "the acquisition of such stock shall be treated as though the parent corporation had redeemed its own stock." Under subsections 302(a) and 302(d) if a corporation redeems its stock as it is defined in subsection 317(b), that is, a corporation acquires its stock from a shareholder in exchange for property, such redemption shall be treated as a distribution in exchange for the stock or a distribution of property under section 301. If such distribution in redemption does not qualify as a distribution in exchange for the stock under section 303(a) or 302(b) with reference to the stock of the parent corporation but is treated as a distribution of property under section 301 pursuant to section 302(d) then subsection 304(b)(2)(B) provides that the determination of the amount which constitutes a dividend to the selling shareholder shall be made "as if" the property were distributed by the subsidiary to its parent and immediately thereafter distributed by the parent. Having considered the committee reports concerning the original enactment and reenactment of this provision we find no congressional intent that the plain meaning of the statutory provisions should be construed to be limited to determining the tax consequences to the selling shareholder only. To the extent that any intent can be gleaned from the committee reports, it appears that Congress intended that the parent be considered to have redeemed its own stock for purposes other than the determination of the tax at the selling shareholder level, as it retained the former provision of

---

[5] Sec. 1.304-3(a), Income Tax Regs.:

Acquisition by a subsidiary.

(a) If a subsidiary acquires stock of its parent corporation from a shareholder of the parent corporation, the acquisition of such stock shall be treated as though the parent corporation had redeemed its own stock. For the purpose of this section, a corporation is a parent corporation if it meets the 50 percent ownership requirements of section 304(c). The determination whether the amount received shall be treated as an amount received in payment in exchange for the stock shall be made by applying section 303, or by applying section 302(b) with reference to the stock of the issuing parent corporation. If such distribution would have been treated as a distribution of property (pursuant to section 302(d)) under section 301, the entire amount of the selling price of the stock shall be treated as a dividend to the seller to the extent of the earnings and profits of the parent corporation determined as if the distribution had been made to it of the property that the subsidiary exchanged for the stock. In such cases, the transferor's basis for his remaining stock in the parent corporation will be determined by including the amount of the basis of the stock of the parent corporation sold to the subsidiary.

section 304(a)(2) rather than that proposed by the Ways and Means Committee which would have treated the subsidiary as having redeemed its own stock, thereby limiting any tax consequences to the selling shareholder and the subsidiary corporation.

Petitioner has emphasized the language of section 304(b)(2)(B) and respondent's regulation thereunder as implicitly denying that the redemption under section 304(a)(2) is for any purpose other than for determining the amount of distribution which is a dividend to the selling shareholder.

In our view the "as if" language used in the statute and regulations does not imply that there is no constructive distribution to the parent but indicates that, with respect to the amount of the actual distribution from the subsidiary which is a dividend to the shareholder, the earnings of the parent available for distribution include the distribution of property which had in fact been made by the subsidiary to the selling shareholder. While it could be argued that section 304(b)(2)(B) is superfluous in light of our interpretation of section 304(a)(2), there is nothing in section 304(b)(2)(B) contrary to our view. We note that section 304(b)(2)(B) was added in 1954 and merely reiterated what had been considered the amount of the dividend, if any, to the selling shareholder under the 1939 Code provision from which section 304(a)(2) was derived. See H. Rept. No. 2319, *supra.* In our view, section 304(b)(2)(B) was enacted and respondent's regulations were subsequently promulgated to conform to the rationale of the provision now contained in section 304(a)(2) which under our interpretation treated the subsidiary's distribution as a distribution by the parent in redemption of the parent's stock. Instead of implicitly denying a constructive distribution to the parent, section 304(b)(2)(B) infers that there is such a constructive distribution. This section and respondent's regulations recognize that in determining the amount of the dividend to the shareholder the property distributed is deemed to have been to the parent and then from the parent. Certainly section 304(b)(2)(B) is conducive to our understanding of section 304(a)(2).

We note that to accept petitioners' contentions that section 304(a)(2) treats a distribution from a subsidiary to a selling shareholder of the parent for stock of the parent as a distribution in redemption of the parent's stock insofar as it pertains to the shareholder but not with respect to the parent could produce

unwarranted results. To the extent this interpretation permitted the subsidiary's earnings to be reduced without a dividend to the parent, there would be a bail out of the subsidiary's earnings without any tax to its shareholders. For example, assuming the selling shareholders were accorded dividend treatment under sections 302(d) and 301 pursuant to section 304(a)(2) and there were zero earnings and profits at the parent level but sufficient earnings available at the subsidiary level, petitioners would conclude that the shareholder received a dividend to the full extent of the subsidiary's distribution since they readily concede, as we think they must, that the determination of the amount which is a dividend to the selling shareholder is made as if the property were distributed to the parent and then to the shareholder. Although petitioners fail to discuss whose earnings are reduced by the amount of the distribution determined to be a dividend to the selling shareholder, presumably the earnings of the subsidiary would be reduced, since in our example there were no earnings at the parent level. The effect of this rationale would be to bail out the subsidiary's earnings with only a tax at the selling shareholder level and avoid any tax at the parent level. To avoid this distortion there must have been a constructive distribution to the parent from the subsidiary which would be a dividend to the parent to the extent of the subsidiary's earnings.

Having determined that there was a constructive distribution from Bankers to Union by virtue of Union having redeemed Union's stock pursuant to section 304(a)(2) with funds of Bankers, the amount of Bankers' distribution to the extent of Bankers' earnings available for distribution is taxable as a dividend to Union since the gross amount of a dividend is includable in a life insurance company's gross investment income under section 804(b)(1)(A).[6] Union's share of the investment yield, less deductions for Union's share of the dividends received deduction and certain other deductions specified in section 802(a)(2) is includable in Union's life insurance company taxable income under phase I.

The next question is whether the constructive distribution from Bankers and the distribution in redemption from Union

---

[6] SEC. 804(b). GROSS INVESTMENT INCOME.—For purposes of this part, the term "gross investment income" means the sum of the following:

(1) INTEREST, ETC.—The gross amount of income from—

(A) interest, dividends, rents, and royalties, * * *

generated a phase III tax to either or both Bankers and Union. Under section 802(b) life insurance company taxable income includes under phase III "the amount subtracted from the policyholders' surplus account" as determined under section 815. Under section 815(c)(3) the amount subtracted from the policyholders surplus account is the amount which is treated under section 815 "as distributed out of the policyholders surplus account." Section 815(a) [7] as of December 31, 1963, and respondent's regulations [8]

[7] Sec. 815(a) prior to its amendment effective January 1964 provided as follows:

SEC. 815. DISTRIBUTIONS TO SHAREHOLDERS.

(a) GENERAL RULE.—For purposes of this section and section 802(b)(3), any distribution to shareholders after December 31, 1958, shall be treated as made—

(1) first out of the shareholders surplus account to the extent thereof,

(2) then out of the policyholders surplus account, to the extent thereof, and

(3) finally out of other accounts.

For purposes of this section, the term "distribution" includes any distribution in redemption of stock or in partial or complete liquidation of the corporation, * * *

[8] Sec. 1.815-2, Income Tax Regs., provides in part as follows:

(a) *In general.* Section 815 provides that every stock life insurance company subject to the tax imposed by section 802 shall establish and maintain two special surplus accounts for Federal income tax purposes. These special accounts are the shareholders surplus account (as defined in section 815(b) and sec. 1.815-3) and the policyholders surplus account (as defined in section 815(c) and sec. 1.815-4). To the extent that a distribution to shareholders (as defined in paragraph (c) of this section) is treated as being made out of the shareholders surplus account, no tax is imposed on the company with respect to such distribution. However, to the extent that a distribution to shareholders is treated as being made out of the policyholders surplus account, the amount subtracted from the policyholders surplus account by reason of such distribution shall be taken into account in determining life insurance company taxable income under section 802(b).

(b) *Priority system for distributions to shareholders.* (1) For purposes of section 815 (other than subsection (e) thereof relating to certain mutualizations) and section 802(b)(3) (relating to the determination of life insurance company taxable income), any distribution made to shareholders after December 31, 1958, shall be treated in the following manner:

(i) Distributions shall be treated as first being made out of the shareholders surplus account (as defined in section 815(b) and sec. 1.815-3);

(ii) Once the shareholders surplus account has been reduced to zero, distributions shall then be treated as being made out of the policyholders surplus account (as defined in section 815(c) and sec. 1.815-4) until that account has been reduced to zero; and

(iii) Finally, any distributions in excess of the amounts in the shareholders surplus account and the policyholders surplus account shall be treated as being made out of other accounts (as defined in sec. 1.815-5).

(2) For purposes of subparagraph (1) of this paragraph, in order to determine whether a distribution (or any portion thereof) shall be treated as being made out of the shareholders surplus account, policyholders surplus account, or other accounts, the amount in such accounts at the end of any taxable year shall be the cumulative balance in such accounts at the end of the taxable year, computed without diminution by reason of a distribution (or any portion thereof) during the taxable year which is treated as being made out of such accounts. * * *
* * *

(c) *Distributions to shareholders defined.* (1) * * * the term "distribution", as used in section 815(a) and paragraph (b) of this section, means any distribution of property made by a life insurance company to its shareholders. For purposes of the preceding sentence, the term "property" means any property (including money, securities, and indebtedness to the company) other than stock, or rights to acquire stock, in the company making the distribu-

thereunder provided in part that any distribution to shareholders including any distribution in redemption of stock is treated as made out of the shareholders surplus account and then out of the policyholders surplus account and then other accounts.

We have determined that Bankers constructively made and Union constructively received a distribution which was taxable as a dividend to the extent of Bankers' earnings and that Union made a distribution to General in redemption of Union's stock pursuant to section 304(a)(2). It is clear to us that the payment by a subsidiary of the purchase price for acquiring some shares of the parent's stock from a shareholder of the parent which is treated as a distribution by the parent in redemption of its stock pursuant to section 304(a)(2) is nonetheless a distribution of property by Union to its shareholder in redemption of its stock within the meaning of section 815(a) and respondent's regulations thereunder. Section 815(a) during the taxable year in issue provided that "the term 'distribution' includes any distribution in redemption of stock" and section 1.815-2(c), Income Tax Regs., provided that a distribution results "in any case in which a corporation acquires the stock of a shareholder in exchange for property in a redemption" under section 302(a) or 302(d). Petitioners are again arguing albeit in a different context, for narrowing the scope of section 304(a)(2). For reasons heretofore discussed, we find this argument unpersuasive. For these reasons we conclude that Union made a distribution to shareholders within the meaning of section 815(a) and to the extent that the amount of this distribution was treated as having been made from Union's policyholders surplus account, such amount generated a phase III tax to Union.

The amount that Bankers paid General for its Union shares, which we have determined was constructively distributed by Bankers and constructively received by Union and taxable as a dividend to Union to the extent of Bankers' earnings, was a distribution of property from Bankers to Union within the

---

tion. Thus, for example, the term includes a distribution which is considered a dividend under section 316, but is not limited to the extent that such distribution must be made out of the accumulated or current earnings and profits of the company making the distribution. * * * there is a distribution within the meaning of this paragraph in any case in which a corporation acquires the stock of a shareholder in exchange for property in a redemption treated as a distribution in exchange for stock under section 302(a) or treated as a distribution of property under section 302(d). * * *

meaning of section 815(a) and respondent's regulations which state that the term distribution "includes a distribution which is considered a dividend under section 316" but is not limited to the extent of the earnings available of the company making the distribution. For this reason we conclude that Bankers made a distribution to shareholders within the meaning of section 815 and to the extent the distribution was made out of the policyholders surplus account of Bankers, Bankers is subject to tax under phase III.

We agree with petitioners that Congress intended to exact a tax when a life insurance company makes a distribution of amounts of untaxed income which it has determined are not required to be retained to fulfill future contractual liabilities arising out of its insurance policies. However, the incidence of taxation depends on whether there has been a distribution out of the policyholders surplus account, that is, a distribution in excess of previously taxed income. *Imperial General Life Insurance Co.*, 60 T.C. 979, 984-986 (1973). See sec. 1.815-2, Income Tax Regs.; S. Rept. No. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 788.

The final issue for decision is whether Union is entitled to deductions for the taxable years here at issue for amortization of the cost of blocks of accident and health insurance policies in force that it acquired from other insurance companies pursuant to reinsurance assumption agreements and for which it paid a premium.

Union claimed deductions by amortizing the cost of each of its acquisitions over 7 years with 20 percent of the cost deducted in the first year and the balance proportionately deducted in the remaining 6 years. It is Union's position that pursuant to section 1.817-4(d), Income Tax Regs.,[9] a reinsurer may amortize his cost of acquiring blocks of accident and health insurance policies in force over the reasonably estimated life of the contracts, irrespective of the types of such policies and the maintenance of

---

[9] This regulation is with respect to computation of tax by a life insurance company. Union was a life insurance company for all years here in issue except 1960. Although respondent in his notice of deficiency assigns as one reason for disallowing the deductions for amortization by Union that it was a casualty company when the contracts were acquired, in his brief respondent makes no point of the change of Union's status to a life insurance company beginning in 1961. The facts show that some of the policies acquired by Union at a premium were acquired before 1961 and some after. However, the record is clear that except for the year 1960, during the years here in issue Union was a life insurance company under sec. 801 and its Federal income tax is computed as such.

reserves in addition to unearned premium reserves. Union argues that cancelable as well as guaranteed renewable and non-cancelable accident and health insurance policies have a limited useful life which is reasonably ascertainable and that the method it used to compute its claimed deductions was proper.

Respondent's position is that the cost of acquiring blocks of accident and health insurance policies is not subject to an allowance for amortization. He argues blocks of accident and health insurance policies have an indeterminate useful life, relying on *International Life Insurance Co.,* 51 T.C. 765, 773-774 (1969), affd. per curiam 427 F. 2d 137 (6th Cir. 1970); Rev. Rul. 69-375, 1969-2 C.B. 146, and, in the alternative, that Union did not show that the blocks of policies had a limited useful life of reasonably ascertainable duration. Further, respondent argues that the policies acquired were a capital asset in the nature of goodwill analogous to insurance expirations, relying on *Commissioner v. Killian,* 314 F. 2d 852 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; *Marsh & McLennan, Inc.,* 51 T.C. 56 (1968), affd. 420 F. 2d 667 (3d Cir. 1969); *Alfred H. Thoms,* 50 T.C. 247 (1968).

Section 809(d)(12) provides that a life insurance company is entitled to deduct from its gains from operations (section 809(b)(1)) all deductions subject to stated modifications, provided for in computing taxable income under subtitle A to the extent such deductions are not allowed in computing investment yield.[10] Such deductions include amounts representing the amortization over the reasonably estimated useful life of the contracts of a premium paid by a reinsurer under an assumption reinsurance agreement to the reinsured. Without an explicit regulation the fact that such a deduction was intended under section 809(d)(12) would be reasonably clear since amortization of amounts paid to acquire intangible assets has uniformly been held to be an allowable deduction in the computation of a taxpayer's taxable income where the intangible asset has a reasonably ascertainable useful life. However, in connection with interpreting section 817 dealing with certain capital transactions by life insurance companies, respondent's regulations specifically provide for such an amortization deduction and define

---

[10] SEC. 809(d)(12). OTHER DEDUCTIONS.—Subject to the modifications provided by subsection (e), all other deductions allowed under this subtitle for purposes of computing taxable income to the extent not allowed as deductions in computing investment yield.

"reasonably estimated life" as the period during which the contract reinsured remains in force based on the facts in each case. Sec. 1.817-4(d)(1) and (2), Income Tax Regs.[11]

This regulation does not refer only to life insurance contracts but refers to contracts of a "particular type" reinsured by a life insurance company. Under section 801(a) and (e)[12] a life insurance company is defined as an insurance company engaged in the business of issuing life insurance and annuity contracts, or noncancelable contracts of health and accident insurance

---

[11] Sec. 1.817-4(d), Income Tax Regs.:

(d) *Certain other reinsurance transactions.* (1) For any taxable year beginning after December 31, 1958, the reinsurance of all or a part of the insurance contracts of a particular type by a life insurance company, in either a single transaction, or in a series of related transactions, occurring in any such taxable year, whereby the reinsuring company or companies assume all liabilities under such contracts, shall not be treated as the sale or exchange of a capital asset but shall be subject to the provisions of sections 806(a) and 809 and the regulations thereunder. However, if in connection with a transaction described in the preceding sentence the reinsured or reinsurer transfers an asset which is a capital asset within the meaning of section 1221 (as modified by section 817(a)(2)), such transfer shall be treated as the sale or exchange of a capital asset by the transferor.

(2)(i) The consideration paid by the reinsured to the reinsurer in connection with a transaction described in subparagraph (1) of this paragraph shall be treated as an item of deduction under section 809(d)(7). However, any amount received by the reinsured from the reinsurer shall be applied against and reduce (but not below zero) the amount of such consideration, and to the extent that it exceeds such consideration, shall be treated as an item of gross amount under section 809(c)(3).

(ii) In connection with an assumption reinsurance (as defined in paragraph (a)(7)(ii) of sec. 1.809-5) transaction, a reinsurer shall in any taxable year beginning after December 31, 1957—

(a) Treat the consideration received from the reinsured in any such taxable year as an item of gross amount under section 809(c)(1), and

(b) Treat any amount paid to the reinsured, to the extent such amount meets the requirements of section 162, as a deferred expense under section 809(d)(12) and amortize such amount over the reasonably estimated life (as defined in subdivision (iii) of this subparagraph) of the contracts reinsured, irrespective of the taxable year in which such amount was paid to the reinsured.

(iii) For purposes of this subparagraph, the term "reasonably estimated life" means the period during which the contract reinsured remains in force. Such period shall be based on the facts in each case (such as age, health, and sex of the insured, type of contract reinsured, etc.) and the assuming company's experience (such as mortality, lapse rate, etc.) with similar risks.

[12] SEC. 801. DEFINITION OF LIFE INSURANCE COMPANY.

(a) LIFE INSURANCE COMPANY DEFINED.—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves, comprise more than 50 percent of its total reserves (as defined in subsection (c)).
* * *

(e) GUARANTEED RENEWABLE CONTRACTS.—For purposes of this part, guaranteed renewable life, health, and accident insurance shall be treated in the same manner as noncancellable life, health, and accident insurance.

(including guaranteed renewable) if its life insurance reserves plus unearned premiums, and unpaid losses on its life, health, and accident policies not included in such reserves comprise more than 50 percent of its total reserves.

Because a life insurance company does not issue or acquire only life insurance policies, it seems logical that when the regulation refers to "contracts of a particular type," it must intend to include any type contract or policy which a life insurance company might issue or acquire. In the light of the provision of section 1.817-4(d), Income Tax Regs., which we referred to as permitting a deduction for amortization of cost of acquiring reinsurance in *Kentucky Central Life Insurance Co.,* 57 T.C. 482, 501 (1972), an insurance company, in order to be entitled to the amortization deduction it claims, must show that the blocks of insurance it acquired from other insurers at a premium, intangible capital assets, have an ascertainable cost separate and distinct from goodwill and a limited useful life, the duration of which can be reasonably estimated. *Houston Chronicle Publishing Co. v. United States,* 481 F. 2d 1240, 1250 (5th Cir. 1973); *Computing & Software, Inc.,* 64 T.C. 223 (1975). In *Kentucky Central Life Insurance Co., supra* at 500-502, we held that the cost of acquiring blocks of life insurance contracts under a reinsurance agreement was amortizable as to industrial policies over a 6-year life and as to ordinary life policies over a 9-year life. In concluding that the best method of amortization as shown by the evidence was an average useful life for the block of contracts acquired we stated at page 502:

> While respondent's regulations, sec. 1.817-4(d)(2)(iii), define the term "reasonably estimated life" as the "period during which the contract reinsured remains in force" based on the facts in each case, such as the age, health, and sex of the insured, etc., it seems clear that this definition is useful when one or a few life insurance contracts are reinsured, but would be impractical when a great many contracts are involved, as here. * * *

Even though no limitation is placed by respondent in section 1.817-4(d) of the regulations on the type of policies on which a reinsurer shall, upon a reinsurance assumption, treat any premiums paid for the policies as a deferred expense and amortize the amount over the reasonably estimated life of the contract, in his brief respondent argues that the only premiums which may be amortized are those paid with respect to the acquisition of long-term policies with respect to which a reserve in addition to the

unearned premium reserve must be carried by the insurance company to cover its obligations to policyholders as they arise in the future.

Respondent bases his argument almost entirely on the provisions of his Rev. Rul. 69-375, 1969-2 C.B. 146.[13]

---

[13] Rev. Rul. 69-375, 1969-2 C.B. 146:

Advice has been requested whether the consideration paid by a life insurance company in acquiring a block of cancellable accident and health policies under an assumption reinsurance agreement may be treated as a deferred expense under section 1.817-4(d) of the Income Tax Regulations that may be amortized over the reasonably estimated life of such contracts.

Under an assumption reinsurance agreement effective December 31, 1967, X life insurance company ceded to Y life insurance company all of its cancellable accident and health policies in force. Pursuant to each such agreement, Y became solely liable to the policyholders on the policies assumed, and the relationship between X (the original insurer) and the policyholders was terminated. On the policies transferred to Y there were unearned premiums of 20x dollars at December 31, 1967. The purchase price (consideration) paid by Y to X was three times the unearned premiums. Both X and Y are taxable as life insurance companies for Federal income taxes under Part I of Subchapter L of the Internal Revenue Code of 1954.

Generally, cancellable health and accident contracts are issued for a period of 12 months or less. Moreover, the insurer is not under an obligation to renew or continue the policy at specified premiums as is the case with long term life insurance or noncancellable health and accident insurance contracts or as in the case of guaranteed renewable health and accident insurance contracts where the premium may be adusted but only by classes. Unlike life insurance, noncancellable health and accident, or guaranteed renewable health and accident insurance, cancellable contracts give the insurer the right, in its uncontrolled discretion, to raise the premium rates on individual policies, to alter the scope of the coverage, or to cancel the contract. Thus, not being long term contracts, nothing more than unearned premiums were maintained by X with respect to the contracts reinsured.

Section 1.817-4(d) of the Income Tax Regulations provides in pertinent part that:

"(1) For any taxable year beginning after December 31, 1958, the reinsurance of all or a part of the insurance contracts of a particular type by a life insurance company * * *, whereby the reinsuring company or companies assume all liabilities under such contracts, shall not be treated as the sale or exchange of a capital asset but shall be subject to the provisions of sections 806(a) and 809 and the regulations thereunder. * * *

"(2) * * *

"(ii) In connection with assumption reinsurance * * *, a reinsurer shall in any taxable year beginning after December 31, 1957—
* * *

"(b) Treat any amount paid to the reinsured, to the extent such amount meets the requirements of section 162, as a deferred expense under section 809(d)(12) and amortize such amount over the reasonably estimated life * * * of the contracts reinsured * * *.

"(iii) For purposes of this subparagraph, the term 'reasonably estimated life' means the period during which the contract remains in force. Such period shall be based on the facts in each case (such as age, health, and sex of the insured, type of contract reinsured, etc.) and the assuming company's experience (such as mortality, lapse rate, etc.) with similar risks."

The above regulations are applicable in the situation of the acquisition of long term contracts. The particular types of contracts referred to are those which necessitate the maintenance of life insurance reserves for which adjustment must be made, together with adjustment of the assets, under section 806(a) of the Code. Such contracts can be subject to a "reasonably estimated life" as defined because they have a life longer than one year and the acquiring company's experience with regard to mortality, lapse rates, etc. is meaningful. That is not the case, however, in the assumption of cancellable health and accident where the acquiring insurance company "* * * could cancel high risk policies, which would cause a high termination rate in early years followed by a low termination

It is well settled that revenue rulings do not have the force and effect of Treasury Department regulations and are not binding on the courts. *Andrew A. Sandor,* 62 T.C. 469, 481-482 (1974), on appeal (9th Cir., Sept. 30, 1974). We do not agree with respondent's ruling which concludes that cancellable accident and health policies do not have a reasonably estimated life as a matter of law. In reaching this conclusion the ruling misinterprets our holding in *International Life Insurance Co.,* 51 T.C. 765 (1969), which involved an insurance company other than life and made a factual determination. The fact that the contracts acquired are long-term policies necessitating maintenance of life insurance reserves in addition to unearned premium reserves may result in the acquiring company's experience with regard to factors such as mortality and lapse rates being more indicative of the reasonably estimated life of the contracts than are such factors with respect to other contracts without reserves, but this fact does not preclude the cost of acquiring such other contracts from being subject to amortization if a reasonable estimated life is determinable from the available facts.

Section 1.801-3, Income Tax Regs., provides that the terms defined thereunder, including noncancelable life, health, or accident insurance policy, and guaranteed renewable life, health, and accident insurance policy, are to be used in determining if a taxpayer is a life insurance company. As heretofore pointed out, section 801(a) defines a life insurance company for tax purposes. By defining a life insurance company by the relative amounts of its life insurance reserves plus unearned premiums and unpaid losses on noncancelable life, health, or accident policies to its total reserves, Congress chose not to tax the earnings from the

---

rate in later years. In addition, changes in the rate structure and coverage, if atypical of action by the insurance industry generally, would have a substantial impact on lapse rates. * * * reflects perhaps an inherent obstacle to the amortization of cancellable health and accident policies." *International Life Insurance Co.,* 51 T.C. 765, 774. See also Rev. Rul. 65-175, C.B. 1965-2, 41.

In considering the particular type of contract subject to assumption reinsurance, there is no reason why there would be any different result simply because cancellable health and accident contracts are acquired by a life insurance company subject to tax imposed by section 802 of the Code rather than by an insurance company subject to tax imposed by section 831 of the Code.

Accordingly, it is held that the consideration paid by Y to acquire cancellable accident and health contracts may not be treated as a deferred expense under section 1.817-4(d) of the regulations that may be amortized over the reasonably estimated life of such contracts. Such expenditure represents the cost of acquiring an intangible asset having an indeterminate useful life.

life, health, or accident insurance business separately, even though a cancelable accident and health insurance policy, unlike a life insurance contract, generates underwriting income that is ascertainable as the protection afforded under the contract is offered. The risk under a cancelable accident and health insurance policy generally remains constant, the health of a policyholder being relatively constant over the short term of the contract. There is little, if any, investment income with respect to such a cancelable policy since there is no necessity for maintaining any long-term reserve from which investment income would be derived, there being no residual benefits to satisfy.

However, a noncancelable level premium accident and health insurance policy which may not be terminated by the insurance company has an increasing risk as the insured becomes more infirm due to the passing of time. Consequently, a reserve in addition to unearned premium reserve may be set up to fund the company's anticipated liabilities under this type of accident and health contract. Investment income is derived from this reserve. It is not until the obligations under a noncancelable accident and health contract, like a life insurance contract, are fulfilled that the amount of underwriting and investment income of the insurance company can be accurately ascertained. Consequently, in 1942 Congress equated noncancelable accident and health insurance contracts with life insurance contracts in determining the insurance company's taxable status. Sec. 201(b), I.R.C. 1939; S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 611-612. See *United Benefit Life Insurance Co. v. McCrory*, 414 F. 2d 928, 931, 935-936 (8th Cir. 1969). Congress extended the same treatment to guaranteed renewable insurance contracts in 1959. Sec. 801(e). S. Rept. No. 291, *supra,* 1959-2 C.B. at 793. While Congress recognized that it is the necessity of a reserve in addition to an unearned premium reserve in long-term accident and health insurance which compels the same treatment as that accorded life insurance for purposes of determining a life insurance company's taxable status, *Group Life & Health Insurance Co. v. United States,* 434 F. 2d 115 (5th Cir. 1970), there is no indication that Congress intended that the existence of reserves in addition to unearned premium reserves has in itself any import with respect to determining the useful life of long-term noncancelable and guaranteed renewable accident and

health insurance or the useful life of cancelable policies acquired at a premium. The mere fact that under the law of some States a reserve in addition to the unearned premium reserve is required for noncancelable and guaranteed renewable policies, but in Texas such a reserve is not required, does not affect whether these policies have a reasonable determinable useful life although the fact that such a reserve is required might make the useful life easier to determine. Likewise, cancelable accident and health insurance which has no reserve may have a reasonably estimated useful life. See *Economy Finance Corp. v. United States,* 501 F. 2d 466, 474, 480 (7th Cir. 1974); *Group Life & Health Insurance Co. v. United States, supra.*

The transaction described under section 1.817-4(d)(1), Income Tax Regs., as reinsurance of all or a part of the insurance contracts of a particular type by a life insurance company, which is referred to under section 1.817-4(d)(2)(i) and apparently applicable to section 1.817-4(d)(2)(ii) does not refer to guaranteed renewable and noncancelable insurance contracts under section 1.801-3 as respondent contends but to whole areas of insurance. Section 817(e) and section 1.817-4(c), which provide an exception to the general rule under section 1.817-4(d) that generally denies capital gain treatment on assets transferred in reinsurance transactions, use nearly the same language and expand upon the meaning of insurance contracts of a particular type by giving as an example "an entire industrial department." See S. Rept. 291, *supra,* 1959-2 C.B. at 791, 795, 823.

Respondent's reliance on *International Life Insurance Co.,* 51 T.C. 765 (1969), in Rev. Rul. 69-375, *supra,* and in his argument in this case is misplaced. In the *International* case, this Court held that the consideration paid for cancelable accident and health policies was not subject to amortization as the evidence showing the taxpayer's actual attrition rate of insurance policies reinsured which lacked any pattern was insufficient to establish a determinable period of usefulness in view of the taxpayer's ability to affect the rate of exhaustion by canceling the policies, raising their premium rate, and altering the scope of coverage. The effect of the taxpayer's practices and procedures was insufficiently disclosed to enable us to determine a reasonable rate of exhaustion from the taxpayer's actual experience. We pointed out that the taxpayer's evidence of the rate at which policyholders were actually lost showed a random variation to which we could

ascribe no pattern to determine a useful life of the policies and that the evidence which was found to exist in *Manhattan Co. of Virginia, Inc.*, 50 T.C. 78 (1968), where we found a determinable useful life for customer lists, was lacking as to the cancelable health and accident insurance contracts acquired by the International Life Insurance Co. In the *International Life Insurance Co.* case,[14] we observed that the inadequacy of the evidence reflected "perhaps an inherent obstacle to the amortization of cancelable health and accident policies." (51 T.C. at 774.) See *Klein v. Commissioner*, 372 F. 2d 261 (2d Cir. 1966), affg. per curiam a Memorandum Opinion of this Court. We held under the particular facts in the *International* case that the policies involved therein did not have a reasonably determinable useful life so as to make their cost subject to amortization. Our conclusion was not grounded upon the nature of cancelable accident and health insurance policies, aside from the manner in which their nature affected the determinations of a reasonable estimated useful life, but upon the lack of evidence to find a determinable useful life which we recognized was difficult of proof.[15]

For the above reasons, we conclude that the premium paid by a reinsurer to acquire cancelable, guaranteed renewable, and noncancelable accident and health insurance policies that is apart from goodwill is subject to amortization over the reasonably estimated useful life of the contracts acquired where, from the facts shown in the record, such a reasonably estimated useful life is determinable. In our view the right as a matter of law of life insurance companies to amortize premiums paid for cancelable, guaranteed renewable, and noncancelable policies does not differ from the right of a life insurance company to deduct the premiums paid to acquire industrial life and ordinary life policies. We upheld the request of a life insurance company to

---

[14] See also *S. S. Ballin Agency, Inc. v. Commissioner*, 446 F. 2d 554 (3d Cir. 1971), affg. a Memorandum Opinion of this Court; *Kentucky Central Life Insurance Co.*, 57 T.C. 482 (1972); *Standard Life & Accident Insurance Co.*, T.C. Memo. 1974-242, on appeal (10th Cir., Dec. 12, 1974).

[15] Respondent's only argument with respect to the noncancelable and guaranteed renewable policies, other than the contention that petitioner has failed to prove the reasonable estimated useful life of the policies acquired, is that since Texas law does not require a reserve in addition to an unearned premium reserve for these policies, their cost is not properly amortizable. Respondent does not contend that the *International Life Insurance Co.* case (51 T.C. 765 (1969)) controls as to policies other than cancelable as a matter of law.

such an amortization deduction in *Kentucky Central Life Insurance Co., supra.* See *Manhattan Co. of Virginia, Inc., supra* at 88-91. In our view our issue here is one of fact.[16]

Goodwill is the expectancy that customers, for whatever reason, will indefinitely continue to patronize a business with which they have developed a business relationship. *Boe v. Commissioner,* 307 F. 2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961); *Skilken v. Commissioner,* 420 F. 2d 266, 268 (6th Cir. 1969), affg. 50 T.C. 902 (1968). The prospect of an indefinite business relationship precludes any reasonable determination of a useful life. *Thrifticheck Service Corp. v. Commissioner,* 287 F. 2d 1, 4 (2d Cir. 1961), affg. 33 T.C. 1038 (1960). See *Houston Chronicle Publishing Co. v. United States, supra* at 1247-1248.

On the basis of the facts in this case we conclude that the blocks of insurance were not assets in the nature of goodwill with an indeterminate useful life and that no part of the premium paid to acquire these contracts was paid for goodwill or a`` j asset in the nature of goodwill.

The record in this case demonstrates that none of the consideration paid for the contracts reinsured represented payment for goodwill. The purchase price was based on a fixed formula of a multiple of the monthly premium in force which did not include any value for goodwill and the parties to the reinsurance transaction bargained at arm's length without considering goodwill. There was no transfer of an entire going concern or sale of the name or use of the location of the business. We do not attach any significance to the few employees of the reinsureds who ultimately were employed by Union as there is no evidence either that they were instruments for transferring the goodwill of the reinsured or that their employment was contemplated at the time of the bargain between the reinsureds and Union.

Union acquired a productive asset of the reinsureds. The value of this asset was not in any preexisting business relationship

---

[16] Respondent in his brief states:

"If it be assumed that the reinsured policies had no value beyond their termination, petitioner would be entitled to amortize the policies over any period that it was able to establish by acceptable evidence to be the average life of the policies. * * *"

In our view this is in effect a concession by respondent that the issue here is one of fact although in other portions of his brief he argues that as a matter of law cancelable policies are not amortizable.

between the reinsureds and their policyholders. In fact, there is some doubt whether there was a substantial relationship between the reinsureds and their policyholders since insurance policies are usually sold by an agency force and it is that relationship to which any goodwill which might be generated will inure.

In *International Life Insurance Co., supra* at 773, we considered respondent's argument and the cases to which he directed our attention in support thereof that the blocks of insurance in force acquired pursuant to assumption insurance agreements were capital assets in the nature of goodwill analogous to insurance expirations and we found his argument unpersuasive and the cases relied on neither helpful nor determinative. Both the *Thoms* and *Marsh & McLennan* cases deal with the transfer of a going insurance agency business, the assets of which included goodwill, insurance expirations, and other intangible assets, and we found on the basis of the record in each case that the expirations were so inextricably linked with goodwill that they could not be considered separate therefrom. Under the facts of the instant case, there was no transfer of an ongoing business with depreciable and nondepreciable property. There was only one asset transferred, and it was a wasting asset.

While the transfer of the blocks of insurance in force does serve some collateral soliciting function for the reinsurer with respect to new business which might result from others acquainted with the policyholders of the policies reinsured or from such policyholders themselves, on the basis of this record we conclude that any continuing advantage which Union might have obtained in the nature of goodwill was de minimis. It is clear that the transfer of the contracts and the termination of business operations by the reinsureds except Republic was not expected to result, nor did it result, in Union's establishing a self-generating accident and health insurance business that was directly or indirectly derived from the ceding companies. In other words, under the facts of the instant case, there was not the generation of new business from the reinsured contracts which might be considered to be in the nature of continuing goodwill. The primary asset acquired by Union was the possible retention of business existing at the time of the reinsurance transaction. This asset necessarily diminished as a policyholder declined to renew his policy. Cf. *Commissioner v. Killian*, 314 F. 2d 852 (5th Cir. 1963), affg. a Memorandum Opinion of this Court, where insur-

ance expirations were found to be goodwill because as a factual matter this accessibility of the insureds gave reasonable expectation that the old customers would resort indefinitely to the old place in view of the accompanying sale of a partnership interest in an insurance business formerly wholly owned by the transferor and of the transferor's personal insurance business. Similarly, *Skilken v. Commissioner, supra.*

Having established the cost of the blocks of insurance is separate and distinct from goodwill, Union must still establish that the policies within the blocks of insurance acquired have a limited useful life which is reasonably ascertainable.[17] To carry its burden Union must show with reasonable certainty or reasonable accuracy the period during which the contracts reinsured would reasonably be expected to remain in force based on the facts with respect to the policies it acquired, and its experience as to lapse rate, with similar risks. Sec. 1.817-4(d), Income Tax Regs. The issue is one of proof of the period during which the policies within a block of insurance would terminate or would not have continued.

Where there are a great many contracts involved, the extent of this period may be shown by the estimated average life of the contracts included in the various components of the insurance business reinsured. *Kentucky Central Life Insurance Co., supra* at 502. While the tendency of a cancelable, guaranteed renewable, and noncancelable accident and health policy within a block of insurance to remain in force does vary, under the facts shown in this case the variation is so slight that the average useful life of each type of accident and health policy is not perceptively different than the average useful life of the block. Consequently it is not necessary or helpful to splinter a block of accident and health insurance into lesser components, each of which contain either cancelable, guaranteed renewable, or noncancelable accident and health insurance policies. In *Super Food Services, Inc. v. United States,* 416 F. 2d 1236 (7th Cir. 1969), it was held in reserving the lower court's entry of summary judgment that a

---

[17] The issuance of the same or another type of insurance policy to the policyholders of the policies reinsured and to the family and friends of such policyholders does not preclude the contracts reinsured from having a determinable useful life. Sec. 1.817-4(d)(2)(iii), Income Tax Regs., by defining the term reasonably estimated life as the period during which the contract reinsured remains in force, implies that blocks of policies have life spans which are limited, not being indefinite and uncertain, since as respondent concedes all of the reinsured policies will terminate at some time.

reasonably ascertainable useful life was susceptible of determination for retail franchise contracts terminable at will by either party with 30 days' notice and this fact might be shown by an average useful life of the contracts determined on the basis of the transferor's prior experiences with similar contracts which displayed a definite and consistent pattern of termination. Contracts which are terminable at will do not preclude as a matter of law a taxpayer from factually showing a reasonably ascertainable useful life for the contracts. *Western Mortgage Corp. v. United States*, 308 F. Supp. 333, 337 (C.D. Cal. 1969). See *Commissioner v. Seaboard Finance Co.*, 367 F. 2d 646 (9th Cir. 1966), affg. a Memorandum Opinion of this Court; *First Pennsylvania Banking & Trust Co.*, 56 T.C. 677 (1971); *Manhattan Co. of Virginia, Inc., supra.*

In the instant case the record reveals that Union's experience was that a block of accident and health insurance consisting of cancelable, noncancelable, and guaranteed renewable policies had an anticipated average useful life of 7 years weighted in favor of the first year to the extent of 20 percent with the balance spread equally over the remaining 6 years. Union's president, who negotiated the purchase of each of its acquisitions, testified that this average useful life was based on Union's experience and was supported by industry experience wherein a 7-year average runoff was established as being fair. Union's management used a 7-year average useful life to determine whether the persistency was that which they had contemplated when Union acquired the blocks of insurance so that it would realize its anticipated profits and, if the business was not within the norm, they tried to determine the reason for it. Union's president testified that Union did not exercise its right to cancel a policy in those instances where the policy Union acquired was cancelable. Union's actuarial expert, who was imminently qualified having been associated with the insurance industry for 23 years, testified that the lapse of each policy is a function of different variables and that actuarily the lapse of cancelable, guaranteed renewable, and noncancelable accident and health policies can be projected within a particular range at the time of acquisition with a reasonable degree of certainty. However, where essential data is nonexistent within a company, he forms a judgment with respect to lapse based on his experience in the industry. Depending on the various unknown variables, some of which cause lapse of cancelable, guaranteed

renewable, and noncancelable policies to differ, he testified that generally the expected average lifetime of a block of accident and health insurance "would be somewhere from about three and a half years up to about five and a half years," with a greater tendency to lapse in the first year when the policyholder receives an assumption certificate from the reinsurer. He stated that the probability of a 7-year average life exceeding the actual average life was "close to one hundred percent" and in all likelihood the average duration of the policies acquired would not approach 7 years but would be much shorter. Based on information given him as to the policies Union acquired in its insurance assumptions, this expert considered a 7-year amortization period for the premium paid as being based on a very fair estimated useful life. The present economic value of policies within a block of accident and health insurance that will remain in force for 10 to 15 years is approximately 1 percent of the value of the block and policies which will continue beyond that time have almost no impact on the value of a block of insurance as of the date of valuation. Even accounting for the interest discount factor this small value is indicative of how few policies would be continuing after 10 years from the date a block of insurance is acquired. Having reviewed Union's actual experience with respect to the blocks of accident and health insurance that it had acquired, the actuary testified that the useful lives of these policies fall within the range that he and other actuaries known to him had experienced in the past.

After 7 years Union's experience,[18] based on all of its reinsurance acquisitions but for State Insurance Co. of Tennessee (State) for which statistical experience was incomplete, had been that between approximately 74 to 86 percent of the reinsured policies within each such block terminated except for Old National Insurance Co. (Old National). With respect to State and Old National, approximately 79 percent of the reinsured policies of the former had terminated after 6 years and approximately 60 percent of the reinsured policies of the latter had terminated after 7 years. After 4 years, 62 to 74 percent of the reinsured

---

[18] Respondent questions the probative value of Union's actual experience as it revealed no termination pattern to determine a useful life, and failed to disclose the reasons which caused policies within a block of insurance to terminate. While this evidence does not itself establish a useful life of the blocks of insurance which could reasonably be estimated when the policies were acquired it does corroborate an otherwise established average useful life of 7 years. See our comment in *Kentucky Central Life Insurance Co.*, 57 T.C. 482, 501-502 (1972), rejecting the taxpayer's proposal that the cost of policies acquired be amortized by allocating to each year the part of the cost applicable to policies which lapsed in that year.

policies in each block had terminated but for the blocks acquired from Universal Guaranty Insurance Co. and Old National of which approximately 50 percent of the policies within each had terminated. The available statistical data suggests that after 10 years approximately 85 to 92 percent, after 2 years approximately 35 to 60 percent, and after 1 year at least 20 percent of the policies within each block of insurance had terminated. While the actual annual rate of attrition was not totally consistent among the blocks of insurance Union acquired, it is clear that the rate was highest in the first year, and in no instance was this first year lapse rate less than 20 percent. The evidence also shows that the lapse rate decreased in each passing year after a block of insurance was reinsured under an assumption agreement. The lapse for cancelable, guaranteed renewable, and noncancelable policies within a block of insurance showed that cancelable had a slightly higher lapse than guaranteed renewable, and guaranteed renewable had a slightly higher lapse than noncancelable. However, the statistical experience suggests that factors other than the relative numbers of cancelable, guaranteed renewable, and noncancelable policies within a block had a more significant impact on lapse than did the number of policies of each type. In comparing the differences in the rate of lapse of one block of insurance with another there was no pattern to indicate that a predominantly noncancelable and/or guaranteed renewable block of insurance had a longer average life than a predominantly cancelable block of insurance.

Respondent's expert actuary who had almost 15 years' experience with the insurance industry testified that an estimate of the useful life of a block of accident and health insurance at the time of its acquisition may only be determined by intercompany experience, industry experience, and one's own experience in similar situations. He in effect admitted that an estimate of a 7-year average useful life for a block of accident and health insurance was not contrary to his experience.

In our view Union has demonstrated that it had no expectation at the time of each acquisition to cancel any policies within a block of insurance which it had the right to cancel or to alter its premium rate structure and its coverage where it could in such a manner as not to conform to the industry norm, thereby reducing the average useful life of a block of insurance. In fact, Union did not cancel any policies it could and its policy is not to cancel such

policies. There is no evidence that Union changed its rates or coverage so that they were not in harmony with those of the industry and the record suggests that Union's management was conscious of trying to determine whether any of their practices were not consistent with prolonging the life span of a block of insurance for as long as possible and changing those which were not.

Here the record as a whole shows that the reinsured contracts within each block of accident and health insurance would terminate on the average over a 7-year period with at least 20 percent terminating in the first year following the date of the acquisition and the balance terminating relatively consistently over the next 6 years. Therefore, we conclude, based on the facts of this case and Union's experience in reinsuring blocks of accident and health insurance, that each block of insurance had a limited useful life which approximated 7 years. Accordingly, we hold that Union is entitled to amortize the cost of acquiring each of its blocks of accident and health insurance over 7 years with 20 percent of the cost deducted in the first year after the acquisition and the balance deducted equally over the next 6 years.

*Decisions will be entered under Rule 155.*